CHICAGO AND WESTERN INDIANA RAILROAD COMPANY, Plaintiff and Counterdefendant,

v.

BROTHERHOOD OF RAILWAY AND STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYES, et al., Defendants and Counterclaimants.

The BELT RAILWAY COMPANY OF CHICAGO, Plaintiff and Counterdefendant,

v.

BROTHERHOOD OF RAILWAY AND STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYES, et al., Defendants and Counterclaimants.

Nos. 63 C 969, 63 C 970.

United States District Court
N. D. Illinois, E. D.

July 29, 1963.

John H. Park, Chicago, Ill., General Counsel, for Chicago and Western Indiana Railroad Co.

Franklin C. Gagen and Samuel Kassel, Chicago, Ill., for the Belt Railway Company of Chicago.

Alex Elson, Willard J. Lassers; Elson, Lassers & Wolff, Chicago, Ill., Milton Kramer; Schoene & Kramer, Washington, D. C., for defendants.

PERRY, District Judge.

In each of these cases, brought under the Railway Labor Act, the plaintiff railroad seeks an injunction restraining and enjoining a strike or work stoppage by its employees on its railroad. A temporary restraining order was entered in each case and, on the court's motion, the two cases were consolidated for the purpose of hearing.

It appears that for many years the two plaintiff railroads operated under a joint-officers and office force arrangement and that under their agreement the general office work of the two railroads was consolidated and performed by the employees of both railroads in the general offices of the Chicago and Western Indiana Railroad Company. In 1962, the railroads decided to separate their operations.

A Section 6 notice, dated December 28, 1962, and addressed by the railroads to the General Chairman of the Brotherhood of Railway Clerks of each railroad read in part as follows:

"At a meeting in my office on December 21st, I outlined to you, in general terms, the changes in official and rank and file personnel that it will be necessary to make because the joint C&WI-Belt Railway officers and office force arrangements that have existed for many years will be discontinued and separately exclusive offices to be established.

"Because the present agreements between the C&WI RR and its clerical employees and between the Belt Railway and its clerical employees include coverage for certain employees in joint C&WI-Belt offices, it is necessary that revisions be made in both agreements to conform to the changed conditions.

"You are hereby given notice in accordance with the provisions of Section 6 of the Railway Labor Act of the desire of The Belt Railway Company of Chicago and of the Chicago and Western Indiana Railroad Company to revise the current working agreement in effect on each railroad in accordance with the proposal outlined in attachment 'A' and 'B' hereto * * *"

Conferences which followed between the parties produced no agreements and were terminated. On April 16, 1963, the Brotherhood filed application for mediation which was docketed by the National Mediation Board on May 31, 1963.

The instant complaints were filed on June 1, 1963. An answer was filed to each complaint and at the same time, in each case, the defendants filed a counterclaim (later an amended counterclaim) which prayed, among other things, for a mandatory injunction requiring plaintiff railroads to move their headquarters from Clearing, Illinois, back to the Dearborn Street Station in Chicago, or requiring the defendant carriers to restore affected employees to the positions held by them prior to their transfer or otherwise to restore the status quo.

Hearings were held by this court on plaintiffs' motions for a preliminary injunction, and evidence having been heard and exhibits introduced, the court entered an order granting plaintiffs' motions for a preliminary injunction. The order provided—

" * * * that on condition that plaintiffs or either of them now restore Lela M. Neville to the position held by her at Dearborn Station on May 31, 1963, the defendants and all persons in active concert or participation with them are enjoined from engaging in any strike growing out of the controversy set forth in the Findings of Fact against plaintiffs or either of them. This injunction shall continue until the National Mediation Board notifies both parties in writing that its mediatory efforts have failed pursuant to Section 5 First of the Railway Labor Act, or until a determination of plaintiffs' application for a permanent injunction, whichever is earlier."

Thereafter hearings were held in the matter of plaintiffs' application for a permanent injunction and defendants' counterclaim with its prayer for injunction.

The court having considered (a) plaintiffs' application for a permanent injunction and (b) defendants' counterclaim and prayer for injunction, and having further considered the pleadings, oral argument, testimony and documentary evidence, makes the following findings of fact and conclusions of law:

### Findings of Fact

1. Both plaintiffs and counterdefendants, hereinafter referred to as "plaintiffs", are Illinois corporations and are carriers within the meaning of that term as defined in the Railway Labor Act, hereinafter referred to as "the Act".

2. Defendant and counterclaimant Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employes, hereinafter referred to as "defendant", is a labor organization representing classes of employees on both railroads under the Act. The individual defendants and counterclaimants, hereinafter referred to as "individual defendants", are members of the defendant Brotherhood and fairly and adequately represent the employees of plaintiffs represented by the Brotherhood in collective bargaining. These employees are so numerous as to make it impracticable to bring them all before this Court.

3. On March 25, 1938 and for many years prior thereto, the Brotherhood was the duly designated collective bargaining agent under the Railway Labor Act with respect to many of plaintiffs' employees. On or about that date plaintiffs entered into an agreement between themselves and the Brotherhood recognizing that certain employees of each, in the comptometer and stenographic departments in the office of the auditor, represented by the Brotherhood, had for some time rendered services jointly to both carriers. All such employees were assigned to the common principal office of the two carriers in the Dearborn Street Station in the City of Chicago. These employees, while paid by one or the other of the carriers, performed services for both carriers and had seniority rights with either The Belt Railway Company of Chicago, hereinafter referred to as "Belt", or the Chicago and Western Indiana Railroad Company, hereinafter referred to as "Western Indiana". It was agreed that such seniority could be exercised by employees in such departments as to any bulletined position or in reduction or increase in force in such departments, regardless of the carrier by whom the employee was employed. Such arrangements remained in effect from about March 25, 1938 and continued until on or about June 1, 1963. During such period, numerous agreements were entered into between each of the carriers and the Brotherhood relating to rates of pay, rules and working conditions, seniority, and other matters affecting the employment of such employees who performed services for both carriers.

4. The current collective bargaining agreements between each plaintiff and the Brotherhood are dated September 1, 1949. Each governs the hours of service and working conditions of the classes of employees named therein. The agreement of September 1, 1949 has been amended from time to time by collective bargaining between the parties. By such agreement as amended the parties agreed that certain positions should be excepted from all or part of the scope of the agreement and that certain positions should be considered joint positions additional to the joint positions which were the subject of the 1938 agreement.

5. Plaintiff Belt is a terminal and switching railroad organized to provide means for classifying and transferring cars from one railroad to another in the Chicago Switching District. Its operations are all within Cook County, Illinois. It interchanges traffic with 28 railroads. Prior to 1961 Belt's only assets, other than working funds and intangibles, consisted of rolling stock, equipment, other personal property, and trackage rights agreements over the lines of other carriers. Most of the trackage used was until 1961 leased from the plaintiff Western Indiana under a lease agreement dated November 1, 1912. Under the 1912 agreement Belt was given the option of purchasing the properties leased from Western Indiana by giving notice one year prior to September 1, 1962. It gave notice by letter dated March 10, 1961. An application was filed with the Interstate Commerce Commission for approval of the purchase and on August 9, 1961 the transaction was approved by the Interstate Commerce Commission, Finance Docket No. 21542.

In its application to the I.C.C. plaintiff Belt represented "no changes in railroad operations are contemplated as a result of the purchase of the property pursuant to the option on September 1,

1962, no carrier employee should be adversely affected. Consequently, it should not be necessary to consider terms and conditions to meet the requirements of Section 5(2) (F) of the Act;". The application also represented that Belt and Western Indiana had a common board of directors and the same officers.

The I.C.C. in granting its approval to this purchase issued a certificate dated August 9, 1961, which granted approval to the transaction but stated in part:

"It does not appear that railway employees will be adversely affected; however, our approval and authorization will be made subject to the same conditions for the protection of employees as were prescribed in Oklahoma Ry. Co. Trustee Abandonment, 257 I.C.C. 177."

The conditions prescribed in Oklahoma Ry. Co. Trustee Abandonment, 257 I.C.C. 177 are referred to as the "Oklahoma conditions."

6. On December 21, 1962, Mr. J. C. Sidor, manager of labor relations for the plaintiff Belt, met with representatives of the Brotherhood which has a different general chairman on each of the two plaintiff carriers. As of December 21, 1962 Mr. Sidor held the position of manager of labor relations for both plaintiff carriers. At the meeting Mr. Sidor discussed certain contemplated changes affecting clerical employees represented by the Brotherhood in connection with separation of operations between the plaintiff railroads planned to be accomplished shortly after the New Year. Following this discussion and on December 28, 1962, Mr. Sidor served formal written notice, pursuant to Section 6 of the Act, for proposed changes in two articles of the 1949 collective agreements for both plaintiff carriers. Article I of each of these agreements sets forth the scope of the agreement and lists a number of "excepted" positions to which all or certain of the rules in the agreement do not apply. A number of these excepted positions were held by employees working in joint offices headed by joint officers of the two plaintiff carriers. Under the separation of operations, joint officers of the two companies were to be discontinued, joint offices were also to be discontinued, separate officers were to be appointed on each railroad and separate offices for these officers were to be established. In order to bring about this separation, plaintiff proposed to revise the listed exceptions in Article I by eliminating reference to joint positions and substituting comparable positions which would exist under the new arrangements for each railroad, which arrangements contemplated separate offices for separate officers. Also proposed were changes in Rule 5 covering seniority districts by abolishing departmental seniority districts and combining all districts into one seniority group.

7. A meeting was held on January 25, 1963 to discuss the plaintiffs' proposals. The Brotherhood representatives at that time presented written counterproposals accompanied by formal notice, pursuant to Section 6 of the Act, for revisions in 46 rules in the agreements. During the conference the Brotherhood representatives asked Mr. Sidor to explain how he proposed to implement the plaintiff carriers' Section 6 notices of December 28. Mr. Sidor then took each position occupied by an employee in each of the joint offices, except the payroll department, and stated how the plaintiff carriers wished to allocate these positions as between the two railroads.

8. After a meeting on February 4 the carriers informed the Brotherhood that another meeting would be held about February 11. As the carriers did not set a date for a meeting, on or about March 16 the Brotherhood informed the carriers that since more than thirty days had passed and the carriers had failed to set a date for another meeting, it was the desire of the Brotherhood to resume discussion immediately. Accordingly, the carriers agreed to another meeting on March 26.

9. A meeting was had on March 26, 1963 at which were present representa-

tives of the Brotherhood and Mr. Sidor. At this meeting Mr. Sidor served two notices on the representatives of the Brotherhood. One notice was a Section 6 notice making supplemental proposals for comprehensive changes in the agreement and asking that these proposals, together with the proposals made by the Brotherhood on January 25, 1963, be handled concurrently. The second letter, dated the same day, was supplemented by a table which listed some 24 employees and proposed a change in status as to each of these employees by allocating the employee either to the plaintiff Belt or the plaintiff Western Indiana, and the abolition of two positions in which the incumbent had either retired or resigned. As to 12 positions in the auditor's office which performed both Belt and Western Indiana work and as to which the incumbents did not establish seniority on both railroads, it was proposed seven positions be allocated to the Belt, four to Western Indiana, and one eliminated. Other proposals were made relating to how the work was to be performed and the choices to be given to the employees affected.

With some exceptions, the list put into specific form Mr. Sidor's proposal made January 25. In this conference the organization representatives stated that they believed all Section 6 notices served both by the carriers and the Brotherhood should be handled concurrently. They also brought up in the discussion the Oklahoma conditions and one of the proposals made by the Brotherhood Section 6 notice, Rule 2½, concerned with providing protective provisions for employees adversely affected by the change. Mr. Sidor advised the representatives of the Brotherhood that he did not have authority to discuss the matter of protective provisions.

10. Another meeting followed on April 2 at which time Mr. Sidor advised the Brotherhood representatives that it was the plaintiff carriers' opinion that the Oklahoma conditions did not apply, and that the separation of the joint offices did not stem from the sale of the property. The conference continued with a number of rules being discussed with no agreement as to any. The conference was closed by Mr. Sidor stating that he was of the opinion that agreement could not be reached by June 1, and even though agreement was not reached, separation of the offices would take place. The organization representatives took the position that agreement could be reached and that in any event every effort should be made to reach agreement.

11. Another meeting was held on April 10. No progress was made and the Brotherhood representatives indicated they would invoke the services of the National Mediation Board. On April 16 the Brotherhood filed application for mediation under Section 5, First of the Railway Labor Act. On April 17 the plaintiffs requested the Brotherhood to resume direct negotiations instead of mediation. The Brotherhood declined to do so in a letter of April 22. On April 23 the National Mediation Board wrote to Mr. Sidor notifying the plaintiff carriers of the request of the Brotherhood for mediation of the dispute. This letter and a letter identical in content addressed to Belt, read in part as follows:

"The Board is in receipt of an application for mediation from the Brotherhood of Railway & Steamship Clerks, covering a dispute between that organization and the Chicago & Western Indiana Railroad Company, on the following subject:

" 'Request of the Chicago and Western Indiana Railroad Company dated December 28, 1962, that Rules 1, 5 and 8 of the September 1, 1949 General Rules and Working Agreement be amended to effectuate a separation of the joint C&WI-Belt offices as set forth in attachments "A" and "B" * * * '."

The letter also made reference to the disputes growing out of the proposals of the Brotherhood, dated January 25, 1963 for comprehensive revision of the 1949 agreement and the request of the carriers, dated March 26, for a similarly comprehensive revision. On May 7 Mr.

Sidor, on behalf of the plaintiff carriers, wrote the National Mediation Board replying to the letter of the Board and making no objection to mediation except to state that in the opinion of the carriers mediation was premature. On May 13, 1963 the plaintiff Belt posted notice that work of that company currently being performed at Dearborn Street Station would be moved to Clearing on or about June 3. On May 21 notices were given by Belt to 50 employees instructing them to report for work at the Clearing yard of Belt on June 3.

12. As soon as representatives of the Brotherhood learned of the notices they informed the plaintiff carriers that the proposed unilateral transfer of employees from joint offices constituted a change in working conditions in violation of the Act. On May 29, 1963, upon being informed by the Brotherhood the day previously of the carriers' action, the Board, at the request of the Brotherhood, sent a telegram to Sidor calling the carriers' attention to the requirement of the Act that the status quo be maintained and requesting a response by wire.

13. On May 30, 1963, Mr. Sidor, acting for the carriers, submitted a proposed agreement in his handwriting to a Brotherhood representative and asked that it be given consideration. Without waiting for a response to this request, on Friday afternoon, May 31, employees of the carrier represented by the Brotherhood were released from work and on this same afternoon the records of Belt were removed from the Dearborn Station to Clearing.

14. On May 31 the Board sent a telegram jointly to Sidor and G. M. Harrison, Grand President of the Brotherhood, docketing the cases and calling the attention of the parties to Section 6. The telegram reads:

"The Board has today docketed application for mediation dated April 16, 1963, covering dispute between Brotherhood of Railway and Steamship Clerks and Chicago and Western Indiana Railroad as its Case No.

A–6955. Attention of both parties is called to provision of Section 6 of the Railway Labor Act. A mediator will be assigned as promptly as a man is available. Please acknowledge. Joint Sidor, Harrison."

On May 31, 1963 at about midnight a conference was held between the parties and terminated at approximately 3:30 a. m. on June 1. After efforts to reach an agreement were unsuccessful, defendant Brotherhood notified plaintiffs that a strike would begin on both railroads at 6:00 a. m. that day. The strike began as announced and continued for a few hours until plaintiffs obtained an ex parte restraining order which terminated the strike.

15. These actions were filed by the carriers later during the day, Saturday, June 1, and a temporary restraining order secured by the carriers from the Court without notice to the Brotherhood, despite the fact that the representatives of the Brotherhood were well known to the carriers, as they have been in constant negotiation for a period of many years and in fact had been in negotiation the night of May 31–June 1 with regard to this very dispute between the parties, a few hours before the actions were filed.

16. Prior to January 1, 1963 both plaintiff carriers had the same auditor, secretary-treasurer and general counsel and prior to October 9, 1962, the same president and general manager. After the above dates each plaintiff carrier had separate individuals filling the same positions. Employees in the joint offices at the Dearborn Station continued to work in such offices until June 1, 1963, except for the employees in the chief engineer's office who worked in the Dearborn Station until May 23, 1963. After such dates they were transferred and are now working at the Clearing offices of the plaintiff Belt, except for Lela Neville who by order of court was restored to her position at the Dearborn Station, and several employees who were retained at the Dearborn Station to work

exclusively for the plaintiff Western Indiana.

17. Prior to June 3, 1963 (May 23 for employees in the chief engineer's office) 14 employees:

Margaret Holley    Thomas O'Reel
Barbara L. Jones    Ralph Muller
Arlene Pomp    Henrietta Galloway
Dominic Basile    Lela M. Neville
Mary L. Simkowski   Evelyn Byrnes
Thomas J. Shanley   Agnes Banta
Albert J. Kaster    Mildred Chester

were employed at the Dearborn Station in the joint offices of plaintiff carriers. Of this group, six were in positions established by the 1949 collective agreements above referred to with each of the plaintiff carriers, the agreements in this respect being identical. Certain of these positions were excepted from all or part of the agreements. All but three of these employees were initially employed by plaintiff Western Indiana. All but two of these employees had seniority with plaintiff Western Indiana, such seniority ranging from 4 to 25 years. These employees had no seniority with plaintiff Belt. All but two of these employees were for all of their employment paid by Western Indiana which also paid their railroad retirement taxes, health and welfare insurance premiums and withheld their federal income taxes. They were supervised prior to June 3, 1963 (May 23 for employees in the chief engineer's office) by officials who acted jointly for both plaintiff carriers. On June 3, 1963 (May 23 for employees in the chief engineer's office) all of the foregoing employees were transferred to the Clearing offices of plaintiff Belt, a distance of some 13 miles from the Dearborn Station. Thereafter they worked in positions having the same titles in the joint offices. No such positions previously existed on the plaintiff Belt as separate positions. The employees so transferred are now paid by the plaintiff Belt and Belt also pays their railroad retirement taxes, health and welfare insurance, and withholds federal income taxes. They are now supervised by officials who are Belt officials only. Prior to their transfer they performed work for both Western Indiana and Belt. Now they perform work exclusively for Belt. They receive the same rate of pay that they previously received and the amount of their railroad retirement taxes, health and welfare insurance premiums and withholding taxes also remains unchanged.

Two employees (Marie Rehling and Pauline S. Davis) were retained at the Dearborn Station when the transfer was made on June 3. These employees, prior to their retention, worked in the joint offices of the plaintiff carriers under the same circumstances of the employees in the above group but their seniority status—25 years in each case—was with the Belt. They were retained at the Dearborn Station as employees of Western Indiana but prior to this date had no seniority with Western Indiana. Prior to June 3, 1963 they performed work from time to time for both the Western Indiana and Belt. After June 3 they performed work exclusively for Western Indiana. Prior to June 3, 1963 they were supervised by a joint official of both carriers. Since June 3, 1963 they have been supervised by a Western Indiana official acting solely for Western Indiana.

18. Effective June 3, 1963, three clerical positions in the maintenance-of-way office of the plaintiff Belt were abolished. As of June 3, 1963, the work content of these positions were assigned to the newly established chief engineer's office at Clearing and to employees who were transferred to that office from the Dearborn Station, and who previously worked in the joint office of the chief engineer.

19. During the month of May, 1963, an official of plaintiff Western Indiana approached the collective bargaining representatives of the Brotherhood and proposed changes in the salaries of the positions in the auditor's office of Western Indiana which would remain at the Dearborn Station after June 3, 1963. Reductions in salary were proposed as to five

positions; increases were proposed as to two positions.

20. In the collective bargaining agreements of the plaintiff carriers with the Brotherhood, no provision is made for retention of seniority status where an employee leaves or is transferred from the employ of one railroad to another.

21. On June 4, a representative of the National Mediation Board arrived in Chicago and commenced his mediatory efforts with the parties. This Board representative is continuing his efforts to mediate the dispute.

22. On June 14, 1963, this court entered an order conditioned on the plaintiff Belt's restoring Lela Neville to a position held by her in the Dearborn Station on May 31, 1963, and restraining the defendants from engaging in any strike until the National Mediation Board notified both parties in writing that its mediatory efforts had failed pursuant to Section 5 First of the Railway Labor Act, or until a determination of plaintiffs' application for a permanent injunction.

23. The parties have stipulated, and the court will take judicial notice of the fact that the plaintiff railroads constitute a vital part of the railway transportation of the United States; that no less than twenty-eight railroads entering the Chicago area would be compelled to cease operations in the transportation of freight by defendants' strike. Clearly, a work stoppage affecting so many lines would create serious problems affecting the nation's economy and would cause irreparable damage to railroads and public alike.

24. Except for the stipulation mentioned in above paragraph numbered 23, all parties have approached this controversy as though their interests only were controlling. Each party charges that the other comes into court with unclean hands and should therefore be granted no relief.

25. All parties ignore the fact that the public, which is vitally concerned with the well-ordered continuance of operations by the nation's railroads, is not represented here and had no notice whatsoever before the strike was called and put into operation until enjoined by this court's restraining order.

26. Were the court considering only the rights of the parties to these actions, the court would and should apply the doctrine of unclean hands. However, where, as here, the record shows such an overriding public interest, or where the court can take judicial notice of such an interest, the court will not apply the doctrine to the detriment of the public.

27. The labor dispute between the parties involved in each of these actions is a "major dispute" under the Railway Labor Act and as that term has been defined and interpreted by decisions of the Supreme Court since the "River Road" case (Brotherhood of Railroad Trainmen etc., v. Chicago River and Ind. R. R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L. Ed.2d 622) in which the initial entry of a restraining order by this court was ultimately affirmed. The instant cases involve longtime seniorities, change of employers and changes in working conditions—all of which are clearly the subject of mediation.

28. The Brotherhood filed its application for mediation on April 16, 1963, and on May 31, 1963 the National Mediation Board docketed the application. When plaintiffs made the changes complained of and when the defendants authorized and caused to be carried out a peaceful withdrawal of employees from the service of plaintiff railroads, mediation was in progress and still is.

29. Plaintiffs' Exhibit 19, introduced at the hearing, consisting of a copy of a letter dated June 13, 1963, from the Manager Labor Relations of the Belt Railway Company addressed to the Executive Secretary of the National Railroad Adjustment Board, reads, in part:

"This is to serve notice, as required by the rules of the National Railroad Adjustment Board, of our

intention to file an ex parte submission on or before July 11, 1963 covering an unadjusted dispute between this Company and its employes represented by the Brotherhood of Railway & Steamship Clerks, etc., involving the following question:

> " 'Claim of employes that carrier violated the provisions of the current working agreement, when on or about June 3, 1963, it required certain of its employes to perform the work of their assignment at 6900 South Central Avenue, Chicago 38, Illinois, instead of at Dearborn Station, 47 West Polk Street, Chicago 5, Illinois.' "

30. This court in no way passes upon the merits of the dispute involved in these actions, nor, in arriving at its decision, has this court considered the merits of the dispute involved.

### Conclusions of Law

1. The cause of action asserted by plaintiffs arises under the Railway Labor Act. The matter in controversy exceeds the sum of Ten Thousand Dollars ($10,000.00) exclusive of interest and costs. This court has jurisdiction of the parties and of the subject matter under Sections 1331 and 1337 of Title 28 of the United States Code.

2. Under Section 2 Seventh, Section 5 First and Section 6 of the Railway Labor Act, plaintiff carriers are under a duty to make no change in the rates of pay, rules or working conditions in effect at the time of the request of the Brotherhood for the services of the Mediation Board. (45 U.S.C. § 152 Seventh, § 155 First and § 156.)

3. The Railway Labor Act imposes on plaintiffs and defendants a duty to exert every reasonable effort to settle all disputes in order to avoid any interruption of commerce or the operation of any carrier. The parties have clearly failed to carry out this provision of the Railway Labor Act in the instant case.

4. The matters covered by the Section 6 notices served on the Brotherhood by the plaintiffs are proper subjects of collective bargaining between the parties under the Railway Labor Act.

5. The labor dispute between the parties involved in each of these actions is a "major dispute" under the Railway Labor Act.

6. Although the dispute involved here is a major dispute, the strike was called while mediation was in progress and before the procedures set up by the Railway Labor Act had been exhausted. The strike may therefore be enjoined, notwithstanding the Norris-LaGuardia Act.

7. An injunction should issue in each of the instant actions enjoining defendants from striking until all of the procedures set up by the Railway Labor Act have been exhausted.

8. The injunction requested by plaintiffs should be granted, enjoining defendants and all persons in active concert or participation with them from engaging in any strike, growing out of the controversy here involved, against plaintiffs or either of them, such injunction to continue until the National Mediation Board notifies both parties, pursuant to Section 5 First of the Railway Labor Act, that its mediatory efforts have failed.

9. A mandatory injunction should be entered (1) requiring the restoration by plaintiffs of certain named persons and other employees similarly situated to the working conditions and status which they had at the Dearborn Station on April 16, 1963; and (2) enjoining plaintiffs from altering the rates of pay, rules or working conditions of the employees of the plaintiff represented by the Brotherhood which were in effect on April 16, 1963.

10. The court should reserve jurisdiction for the sole purpose of assuring that the provisions of its Order are fully carried out.