**FLORIDA EAST COAST RAILWAY COMPANY, a corporation,**
Appellant,

v.

**BROTHERHOOD OF RAILROAD TRAINMEN, AFL–CIO,**
Appellee.

No. 21356.

United States Court of Appeals
Fifth Circuit.
Aug. 18, 1964.

Chester Bedell, Nathan Bedell, Jacksonville, Fla., William B. Devaney, Washington, D. C., for appellant.

Allan Milledge, Neal Rutledge, Miami, Fla., Sherman L. Cohn, Atty., Barbara W. Deutsch, Dept. of Justice, Washington, D. C., for appellee.

Before TUTTLE, Chief Judge, BROWN, Circuit Judge, and BREWSTER, District Judge.

JOHN R. BROWN, Circuit Judge.

Florida East Coast appeals from the grant of a preliminary injunction [1] which restrains it from operating under working conditions different from those contained in its agreement with the Brotherhood of Railroad Trainmen, the bargaining representative of FEC's employees in the crafts of trainmen and yardmen.[2] The primary question presented is to what extent, if at all, is a Carrier faced with strike conditions free to institute changes affecting rates of pay, rules, or working conditions without complying with the procedures provided in § 6 of the Railway Labor Act?[3]

The unusual importance of the facts giving rise to this controversy requires that we state them in some detail.

### The November 2, 1959 Notice

On November 2, 1959, FEC, along with the other 200-odd Class I Carriers in the United States, issued two notices pursuant to § 6 to its operating organizations, including BRT. One related to "Consist of Crews," the other, to "Basis of Pay and Assignment of Employees." Conferences between individual carriers and the operating organizations failed to produce agreement, and negotiations on a national level were begun.[4] The national negotiations of the November 2, 1959 notice likewise did not produce agreement, and in October of 1960, the Organizations [5] and the Carriers agreed to the creation of a Presidential Railroad Commission which was to investigate and report on the controversy, using its "best efforts, by mediation, to bring about an amicable settlement * * *."[6] On February 28, 1962, the report of the Commission [7] was delivered to the President. National conferences on the remaining unsettled issues resumed on April 2, 1962, and continued through May 17. These conferences did not result in agreement, and on May 21 the Organizations applied for the mediation services of the National Mediation Board pursuant to § 5 of the Act. After numerous meetings [8] had been held under the auspices of the Board without agreement being reached, the Board on July 16, 1962, terminated its services.[9] The Carriers then served notice that they intended to put the November 2, 1959, notice into effect,[10] and the Organizations and Car-

---

1. The injunction was stayed by this Court on March 17, 1964, after argument of counsel and exchange of briefs.

2. These are so-called "operating crafts"; that is, the crafts of employees whose work involves the actual operations of the trains.

3. 45 U.S.C.A. § 156.

4. The FEC executed a power of attorney to the Southeastern Carriers Conference Committee for the purposes of representation in the joint national negotiations.

5. In addition to the BRT, the labor organizations representing operating crafts which were engaged in the national negotiations were Brotherhood of Locomotive Engineers, Brotherhood of Locomotive Firemen and Enginemen, Order of Railway Conductors and Brakemen, and Switchmen's Union of North America.

6. Brotherhood of Loc. Eng. v. B. & O. R. R., 1963, 372 U.S. 284, 286, 83 S.Ct. 691, 9 L.Ed.2d 759. This case contains much background information regarding the national handling of the November 2, 1959 notice, and has been freely relied upon to place the events of record in proper context.

7. The Commission was created by Executive Order 10891 in November 1960, U.S. Code Cong. and Adm.News 1960, p. 1693, and its members were appointed in December of that year. The parties had agreed that the proceedings of the Commission were to be accepted "as in lieu of the mediation and emergency board procedures provided by * * *" §§ 5 and 10 of the Act.

8. Between May 25 and June 22, approximately 32 meetings were held.

9. The Organizations refused to submit the dispute to arbitration.

10. The first notice was actually issued on July 17. The Organizations filed suit alleging that the rule changes encompassed by the July 17 notice of intent would violate the Act. Subsequently, with leave of Court and without objec-

riers began the litigation which was to culminate in the Supreme Court holding that the statutory procedures having been exhausted, the November 2, 1959, notices could be put in effect subject only to the invocation of a § 10 Emergency Board. Brotherhood of Loc. Eng. v. B. & O. R. R., 1963, 372 U.S. 284, 83 S.Ct. 691, 9 L.Ed.2d 759.

While the B. & O. case was making its tortuous way to the Supreme Court, things were happening back at the FEC yard. On January 23, 1963, 11 cooperating, non-operating labor organizations [11] representing certain FEC employees went out on strike over a wage demand as to which all parties concede the procedures of § 6 had been exhausted. The BRT did not issue a strike notice, but its members honored the picket lines of the non-operating organizations and consequently did not report for work. Eleven days later, on February 3, 1963, FEC resumed operations by utilizing supervisory personnel and some replacement workers. It is uncontradicted on this record that replacements utilized in the trainmen and yardmen crafts were worked under conditions which differed from those provided by the collective bargaining agreement then in effect between FEC and the BRT.[12]

Then on March 4, 1963, the B. & O. decision came down, and on March 12, 1963, the FEC withdrew authority from the Southeastern Carriers Conference Committee to negotiate for it the No-

vember 2, 1959, notice. The formal mandate of the Supreme Court in the B. & O. case was received in the District Court in Illinois on April 2, 1963, and on that day the National Railway Labor Conference sent a telegram to the National Mediation Board advising that the District Court upon receipt of the mandate had dissolved the injunction restraining the Carriers from making the November 2, 1959, changes effective, and that the Carriers proposed to make them effective on April 8. On the same day, April 2, FEC advised its operating Organizations including BRT that it proposed to make the November 2, 1959, notices effective on April 3. Likewise on April 2, the Mediation Board certified by letter to the President the existence of an emergency and recommended the appointment of an Emergency Board under § 10. On April 3, Emergency Board No. 154 was created.

Meanwhile, apparently on receipt of FEC's April 2 letter, the BRT issued a strike notice effective April 5. This occasioned no change in FEC's operations since FEC had been struck by the non-operating crafts since January 23, 1963, and during all this time the BRT had honored the picket lines. However, the United States was convinced that FEC could not place the notice into effect until the Emergency Board had finished its investigation of the dispute and the 30-day waiting period provided in § 10 had expired.[13] The United States was success-

tion by the Organizations, the Carriers withdrew the July 17 notice and substituted therefor the November 2, 1959 notices, the changes to become effective on August 16.

11. The organizations are International Association of Machinists; International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers; Sheet Metal Workers International Association; International Brotherhood of Electrical Workers; Brotherhood of Railway Carmen of America; International Brotherhood of Firemen and Oilers; Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees; Brotherhood of Maintenance of Way Employees; The

Order of Railroad Telegraphers; Brotherhood of Railroad Signalmen; and Hotel and Restaurant Employees and Bartenders.

12. The exact terms of employment of the replacement workers need not here be detailed. It suffices to say here that the conditions under which they worked from February 3, 1963, also differed from the conditions as set out in the November 2, 1959, notice but were substantially identical to those formally reduced to writing on September 1, 1963, which are discussed infra.

13. This would put the FEC on a par with the other Carriers which participated in the national handling of the dispute.

ful on May 7, 1963, in obtaining an injunction to that effect. United States v. Florida East Coast Ry., D.D.C., 1963, 221 F.Supp. 325.[14] Emergency Board No. 154 reported on May 13, 1963, and the 30-day waiting period subsequently expired. The FEC and the other Carriers were then free for the first time to put the November 2, 1959, notices into effect.

That is precisely what FEC did. On July 8, 1963, it issued a formal notice to the operating Organizations, including BRT, that on July 10, 1963, the November 2, 1959 notices would be put into effect. The BRT again issued a formal strike notice,[15] but—as in April—this did not change the operating situation since the BRT was still refusing to cross the picket lines of the non-operating crafts who were still out on strike. Consequently, the November 2, 1959, notice was formally[16] in effect as of July 10, 1963.

Then on August 28, 1963, Congress passed Public Law 88–108,[17] which among other things prohibited Carriers which had served the November 2, 1959, notice from unilaterally making changes in "rates of pay, rules, or working conditions encompassed by * * * such" notice and ordered that action of the sort prohibited which had already been taken be rescinded, and "the status existing immediately prior to such action restored."

It further provided that two of the issues encompassed by the November 2, 1959 notice were submitted to binding arbitration[18] and set up the procedure for accomplishing that arbitration. In response to the request of Secretary of Labor Wirtz, the FEC withdrew November 2, 1959, rules which it had formally put into effect on July 10, for the life of Public Law 88–108. When 88–108 expired by its own terms on February 24, 1964, four days before the hearing in the District Court which resulted in the March 2, 1964, preliminary injunction appealed from, the FEC again placed the November 2, 1959, notice formally into effect.[19] This brings us to date with respect to the November 2, 1959, notice. But meanwhile, other things were happening.

### The Union Shop Notice

On July 31, 1963, the FEC issued a new § 6 notice to the BRT that it proposed to cancel the union shop provision of the collective bargaining agreement. Representatives of the FEC and BRT assembled at the Monson Hotel in St. Augustine, Florida, on August 29, 1963, but the conference never began. The FEC insisted on having a Court Reporter present to record the meeting, and the BRT refused to negotiate under such circumstances. Consequently, on September 4, the BRT requested the services of

14. The injunction was conditioned upon FEC's being allowed to participate fully in the proceedings before the Emergency Board.

15. The BRT had voluntarily withdrawn the April strike notice upon the issuance of the injunction in United States v. Florida East Coast Ry., D.D.C., 1963, 221 F.Supp. 325.

16. The word "formally" is used repeatedly for one simple reason. The FEC has never operated under the November 2, 1959, rules. At all times pertinent to this suit subsequent to January 23, 1963, the FEC has operated under conditions which differ from both the collective bargaining agreement as it existed prior to November 2, 1959, and the agreement as it would be constituted after amendment by the November 2, 1959 notice.

17. Act of August 28, 1963, 77 Stat. 132.

18. The portions submitted to binding arbitration were those identified as "[u]se of Firemen (Helpers) on Other Than Steam Power," "Consist of Road and Yard Crews," and certain portions of the Organizations' September 7, 1960, notice relating to the same subject matter. These matters have been settled by agreement of the FEC and its operating Organizations and are not here involved.

19. The notice letter to BRT of February 24, 1964, stated that the 1959 notice would be placed into effect at 12:01 a. m., Tuesday, February 25, 1964. As indicated previously, other settlement had been made of the "Firemen" and "Crew Consist" issues (see note 18, supra), and these portions of the November 2, 1959, notice were excepted from the terms of the letter.

the National Mediation Board. The Board accepted the case, and it was docketed the same day as NMB A–7026. On September 9, the FEC received a letter from the National Mediation Board informing that the matter had been docketed. However, earlier that same day (September 9, 1963), the FEC had written the BRT to say that the conference having been ineffectual and the services of the Mediation Board not having (to its knowledge) been invoked, it was putting the July 31, 1963, notice abolishing the Union Shop into effect. The Union Shop portion of the collective bargaining agreement has not been honored since that date although the matter still pends before the Mediation Board.

### The September 25, 1963 Notice

As we indicate in the preceding statement, the FEC has operated since February 3, 1963, under conditions of employment that differ from both the pre-1959 collective bargaining agreement and the agreement as it would be amended by the November 2, 1959, notice. Those actual operating conditions were formally reduced to writing on September 1, 1963, and all employees hired to work in the trainmen and yardmen crafts since that date have been required to sign a copy of this formal promulgation called by FEC "Conditions of Employment." Then on September 25, 1963, the FEC served a § 6 notice which proposes to amend the collective bargaining agreement to provide rates of pay, rules, and working conditions which all concede are substantially identical to those embodied formally in the "Conditions of Employment" and followed in actual practice since February 3, 1963. On October 30, 1963, the FEC resumed conferences on the November 2, 1959, and the September 25, 1963, notices, discussing the November 2, 1959, notice first. On November 1, 1963, the discussion of the September 25, 1963, notice continued. The parties were still discussing this notice on February 28, 1964, the date of the hearing on BRT's motion for preliminary injunction.

The position of the BRT and the United States as *amicus curiae*, simply stated, is that the FEC has instituted changes in rates of pay, rules, and working conditions without following procedures made mandatory by the Act. They further urge that the injunction was necessary in order to prevent a subversion of the statutory procedures.

The FEC, on the other hand, contends that the complaint of the BRT is that the bargaining agreement is not being complied with. Such complaints, it urges, are "minor disputes" within the exclusive jurisdiction of the Railroad Adjustment Board. It further asserts that whatever the nature of the dispute, major or minor, it is justified by "strike conditions" in operating under the working conditions it has imposed. This is true, it says, despite the fact that the conditions are different from both the pre-1959 agreement and the agreement as it would be constituted after amendment by the November 2, 1959, notice. And, the argument continues, this is so even though the working conditions are substantially identical with the proposal of September 25, 1963, which is presently being discussed by it and the BRT because these are "temporary conditions imposed by strike" and not permanent prospective changes of the "agreement."

█ First, we think that this is clearly a so-called "major dispute" within the meaning of the decisions of the Supreme Court and this Court. Elgin, Joliet & Eastern Ry. v. Burley, 1945, 325 U.S. 711, 723–725, 65 S.Ct. 1282, 89 L.Ed. 1886; Order of Railroad Telegraphers v. Chicago & N. W. Ry., 1960, 362 U.S. 330, 341, 80 S.Ct. 761, 4 L.Ed.2d 774; Missouri-Kansas-Texas R. R. v. Brotherhood of Locomotive Engineers, 5 Cir., 1955, 266 F.2d 335; St. Louis, San Francisco & T. Ry. v. Railroad Yardmasters of America, 5 Cir., 1964, 328 F.2d 749; Aaxico Airlines, Inc. v. Air Lines Pilots Ass'n International, 5 Cir., 1964, 331 F.2d 433. This is not a case like Missouri-Kansas-Texas, Frisco, or Aaxico involving a dispute as to whether the agree-

ment authorizes action taken by the Carrier. Neither is it a case involving a dispute over the meaning of the terms relating to rates of pay, hours, and working conditions. Rather, this is a case in which a Carrier has unilaterally instituted wholesale changes in these terms, changes which, in the negotiations presently going on with respect to the September 25 notice, it seeks to establish permanently. The bulk of the changes were instituted on February 3, 1963, with no pretense at compliance with the Act. Although FEC did serve the July 31, 1963, notice of intent to cancel the Union Shop agreement, the cancellation was formally effected on September 9, 1963, while the matter was pending before the National Mediation Board.[20] Employees hired after September 1, 1963, were made to sign the "Conditions of Employment" which formally reduced to writing the changes of February 3, 1963. Again, this was done with no pretense of compliance with the Act. Finally on September 25, 1963, the FEC served a § 6 notice with respect to those changes. Whether the strike conditions do justify the changes in whole or in part is admittedly a dif-

ficult question, but neither the presence of the question nor its difficulty changes the character of the dispute from "major" to "minor."[21] In short, the controversy is not over what the bargaining contract now permits as a matter of contract construction. The dispute is over the steps FEC can take to extricate itself from the consequences of a strike or other refusal by BRT to supply manpower.

Second, it is equally clear that if this were the ordinary situation of a Carrier not faced with "strike conditions,"[22] the institution of wholesale changes of the sort here involved would be enjoinable by the District Court pending exhaustion of the procedures of the Act. E. g., Manning v. American Airlines, 2 Cir., 1964, 329 F.2d 32; R.R. Yardmasters v. Pennsylvania R. R., 3 Cir., 1955, 224 F.2d 226; Railway Employees' Co-op v. Atlanta B. & C. R. R., D.Ga., 1938, 22 F.Supp. 510; Chicago & W. I. R. R. v. Brotherhood of Ry. & S. S. Clerks, N.D.Ill., 1963, 221 F.Supp. 561; Monon v. Brotherhood of R. R. Trainmen, N.D.Ill., 1963, 215 F.Supp. 430.[23] The rationale of these decisions is a sim-

20. There is no merit to the contention of the FEC that the services of the Mediation Board were not properly invoked because FEC did not receive notice of the invocation within ten days. The Act merely requires that the services be invoked within ten days, as was done here.

21. The fact that the Union Shop and 1949 agreements are still legally "existing" does not convert this into a "minor dispute." Agreements in the railroad industry do not cease to be effective until they are changed in accordance with the Railway Labor Act. As the United States observes, this emphasis on the "'existence of the agreements' is thus a non sequitur."

22. We do not find it necessary to resolve the controversy waged both in the District Court and here as to whether the BRT was actually "on strike" from January 23, 1963, to the date of hearing in the District Court. Although the BRT was formally on strike for only two short periods during that time, it is uncontradicted that its members honored the

picket lines of the non-operating Organizations and did not work and would not until the non-operating strike was terminated. For the purposes of this decision, whatever this might be called we hold that FEC was faced with "strike conditions" from the refusal of BRT to perform essential work.

23. We thus agree with the position of the United States as amicus curiae that the Norris LaGuardia Act, 29 U.S.C.A. § 101, does not bar enforcement of the mandate of the Railway Labor Act. Virginia Ry. v. System Federation, 1937, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789; Graham v. Brotherhood of Firemen, 1949, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22; compare Textile Workers v. Lincoln Mills, 1957, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972; Order of Telegraphers v. Chicago & N. W. Ry., 1960, 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774. Today, as in 1930, the mandates of the Railway Labor Act are enforceable by injunctive decree. Texas & N. O. R. R. v. Railway Clerks, 1930, 281 U.S. 548, 50 S.Ct. 427, 74 L. Ed. 1034.

ple one. Under the structure of the Act, changes "in agreements affecting rates of pay, rules, or working conditions * * * " may be instituted unilaterally only after notice, negotiation and mediation (if requested) and action by the Presidential Emergency Board if conveyed under § 10. In order to insure that the purpose manifested in the Act to provide for orderly settlement of "all disputes" not be frustrated, the status quo must be preserved pending the exhaustion of the statutory procedures. Bargaining is a sham if a Carrier has already done in fact what it formally seeks to do in negotiation of a § 6 notice.

■ But that is precisely what FEC asserts it may do here. With formal negotiations in progress under the September 25, 1963, notice, the argument of FEC that the changes which all parties agree are substantially identical to those embodied in the notice are only temporary (for the duration of the strike) is plainly specious. Through the means of the "Conditions of Employment" which all must sign, it has in fact instituted rates of pay, rules and working conditions over which it is presently bargaining under the procedures of the Act. This it cannot do, and the fact that the changes in actual operations were instituted prior to the § 6 notice can make no difference. In both Manning v. American Airlines, 2 Cir., 1964, 329 F.2d 32, and Chicago & W. I. R. R. v. Brotherhood of Ry. & S. S. Clerks, N.D.Ill., 1963, 221 F.Supp. 561, injunctions were issued against changes which had already been instituted prior to suit.

■ The strike conditions, however, do have relevance to the proper solution of the problem at hand. Opposed both by the BRT and the United States, FEC urges that the collective bargaining agreement is wholly suspended during the strike and that any other holding will make it impossible to avail itself of its right to continue its business during the strike. It is clear that the suspension argument has no merit. The BRT is still the bargaining representative of all the employees in the crafts of trainmen and yardmen whether union members or not. Steele v. L. & N. R. R., 1944, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173. The employees of FEC are entitled to the benefit of the terms of the agreement, and the FEC may not supersede the agreement by individual contracts, whether consented to by the employees or not. Order of Railroad Telegraphers v. Ry. Express Agency, 1944, 321 U.S. 342, 346, 64 S.Ct. 582, 88 L.Ed. 788.[24]

■ But the case does not turn on the question of suspension. Rather, it is a problem of what the law permits when the protagonists have exhausted all of the elaborate governmental machinery for the settlement of a dispute, and neither is willing to budge. That is the situation here. There is an actual strike against FEC by the non-operating Unions. The continuation of the strike by such employees is legal. So, too, is the effort of FEC to operate. But as a result of this strike, BRT declines to supply the craft workers as its contract calls for. So far as FEC's need for these crafts and BRT's failure to supply them, there is no requirement, or provision, for this impasse being resolved under the machinery of the Railway Labor Act. Nothing in the Act forces either compulsory arbitration or acquiescence. At that juncture, what the Act recognizes is that each party is free lawfully to employ self-help. The Supreme Court in this very controversy

24. This case adopted for the Railway Labor Act the classic statement of the rule first announced in J. I. Case Co. v. NLRB, 1944, 321 U.S. 332, 336, 64 S.Ct. 576, 88 L.Ed. 762:

"[H]owever engaged, an employee becomes entitled by virtue of the Labor Relations Act somewhat as a third party beneficiary to all benefits of the collective trade agreement, even if on his own he would yield to less favorable terms. The individual hiring contract is subsidiary to the terms of the trade agreement and may not waive any of its benefits * * *."

made that plain. In its decision of March 4, 1963,[25] it stated:

"* * * What is clear * * * is that both parties, having exhausted all of the statutory procedures, are relegated to self-help in adjusting this dispute * * *."

See also, Order of Railway Conductors v. L & N. R. R., 1964, 5 Cir., 331 F.2d 368.

Indeed, the unquestioned right to resort to self-help is the inevitable alternative in a statutory scheme which deliberately denies the final power to compel arbitration. Cf. NLRB v. Radio & Television Broadcast Eng'rs, Local 1212, 1961, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302. That the occasions for resort to this raw power will be rare under a system which hedges in disputes by elaborate negotiations, mediation and Presidential fact finding machinery, does not deny either the existence of the power, or the present policy determination that, awesome as is its prospect, it is the only way to preserve the last vestige of free contracts, freely made.

Since the right surely exists, the law must accommodate itself to the exercise of this power in a way that will make it effectual. Brotherhood of Railroad Trainmen v. Chicago R. & I. R. R., 1957, 353 U.S. 30, 40, 77 S.Ct. 635, 1 L.Ed.2d 622. Anything less either temporizes with the so-far-determined policy against compulsory arbitration, or puts the full weight of law on the side of the employees by making it impossible for the Railroad to carry on save on the terms and conditions imposed by the organized employees who now refuse to perform as agreed.

To be sure, the law gives much power to organized labor. It discourages, on every hand, industrial and railroad labor strike, walkouts, lockouts, and strikes. But when the machinery of industrial peace fails, the policy in all national labor legislation is to let loose the full economic power of each. On the side of labor, it is the cherished right to strike. On management, the right to operate, or at least the right to try to operate.

This policy is reflected, for example, under the National Labor Relations Act, by decisions such as NLRB v. Mackay Radio & Telegraph Co., 1938, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381; NLRB v. Erie Resistor Corp., 1963, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308; and Redwing Carriers, Inc., 1962, 137 NLRB 1545, affirmed sub nom. Teamsters, Local No. 79 v. NLRB, D.C.Cir., 1963, 325 F.2d 1011. The consequences of self-help are not necessarily confined to the period of strife. Thus, as Mackay Radio and Erie Resistor clearly held, an "employer may operate his plant during a strike and at its conclusion need not discharge those who worked during the strike in order to make way for returning strikers." 373 U.S. 221, at 232, 83 S.Ct. at 1147.

These principles are clearly applicable here. Indeed, the BRT has recognized that where, for example, sufficient crews are not available to maintain the contract structure forbidding road crews from operating trains through terminals, this requirement need not be met. They also concede that supervisory personnel may be used and that as respects the Union Shop agreement, it is not a violation of the agreement or of the Railway Labor Act for FEC to hire and pay nonunion replacements. As a corollary, BRT concedes that FEC has no obligation to fire any such replacement at least until union membership has been declined by him.

But this right of self-help is not a license for wholesale abrogation of the agreement. As the term implies, it is help which is reasonably needed to meet the impasse of a railroad desiring to run and unions unwilling to furnish workers. Some of the practices followed by FEC indicate the nature of the problem and this limitation on self-help. Thus, for example, it is uncontradicted on this record that in order to earn pay for eight hours work, employees must now be on duty for eight and one-half hours (30

25. Brotherhood of Locomotive Engineers v. B. & O. R. Co., 1963, 372 U.S. 284, 291, 83 S.Ct. 691, 9 L.Ed.2d 759.

minutes for lunch), whereas under the 1949 agreement, eight hours pay was earned by seven hours and 40 minutes work (20 minutes for lunch),. or a total of eight hours on-duty time. Likewise, many jobs have been reclassified to six-day rather than five-day, thus avoiding payment of overtime, the practice apparently being to pay overtime only when an employee works a greater number of days than his job description calls for. The duties of switchmen and other yard employees have also been materially changed.

 Although we do not here decide what changes may be reasonably necessary in light of the strike conditions, we hold that in a situation of this sort, it falls to the lot of the District Judge to pass on which changes are in fact necessary in order for FEC to continue to operate. Without placing it in terms of burden of proof and the like, we think it clear that in order for the District Judge to allow FEC to escape the ban on institution of changes pending exhaustion of the statutory procedures recognized by the decisions,[26] he must be convinced that in order to make a meaningful reality of FEC's right to continue to operate, the changes are reasonably necessary. While this appears to move the Judge from the firing line, Townsend v. Sain, 1963, 372 U.S. 293, 319, 83 S.Ct. 745, 9 L.Ed.2d 770, into the locomotive cab, it is not for him to decide what to pay, etc. His task is to pass on what FEC has done or proposes to do.

 Finally, one last matter must be disposed of. The District Court held that the notice of September 25, 1963, superseded the prior November 2, 1959, notice. We think there is nothing either in the timing or intrinsic content of the September 25 notice in relation to the November 1959 notice, or in Brotherhood of Locomotive Fire & Eng. v. Southern Ry., D.D.C., 1963, 217 F.Supp. 58, urged forcefully by BRT and cited by the District Judge to support this view.[27] The parties bargained about each of the notices separately, though both were simultaneously pending for a period of time. Furthermore, it is apparent that the Carriers and Organizations as a matter of practice treat each notice independently. Monon R. R. v. Brotherhood of Railroad Trainmen, N.D.Ill., 1963, 215 F.Supp. 430; Pullman Co. v. Order of Ry. Conductors, 7 Cir., 1963, 316 F.2d 556. The November 2, 1959, notice was not superseded by the September 25, 1963, notice. Order of Railway Conductors v. Louisville & Nashville R. R., 1964, 5 Cir., 331 F.2d 368.

 We restate. The FEC is free to operate under the 1949 collective bargaining agreement as amended by the November 2, 1959, notice, but FEC may not institute changes in rates of pay, rules and working conditions encompassed by the July 31, 1963,[28] and September 25, 1963, notices until the statutory procedures are exhausted. To do so would be to frustrate the statutory mechanism for orderly settlement of major disputes. This portion of the District Court's holding is clearly correct. It is, however, free to institute and maintain such employment practices, etc. as are, and continue to be, reasonably necessary to effectuate its right to continue to run its railroad under the strike conditions. We do not express any opinion as to the outcome of the District Judge's examination of proposed changes under the select, item-by-item approach that we articulate. How-

26. See cases cited in text accompanying note 23, supra.

27. The decision of the same Court in United States v. Florida East Coast Ry., M.D.Fla., 1964, 228 F.Supp. 340 [55 LRRM 2798], is not to the contrary. That case represents legitimate concern for the maintenance of the status quo pending the expiration of Public Law 88–108.

28. We need not here decide whether under applicable precedent, the FEC's insistence on the presence of a reporter at the Monson Hotel bargaining session constituted a refusal to bargain. It is clear that until the Mediation Board disposes of this matter, FEC must comply with the Union Shop agreement.

ever, since he has enjoined the FEC from operating under any terms except those embodied in the pre-November 2, 1959, agreement, we think the most rational approach is to continue our stay of March 17, 1964, until the District Court has an opportunity to consider the nature and scope of the orders to be entered consistent with this opinion. As soon as the District Judge takes hold of the case, our stay will automatically expire.

Affirmed in part.

Reversed and remanded in part.