**Charles H. RUBY, as President of the Air Line Pilots Association, International, et al., Plaintiffs-Appellees,**

v.

**TACA INTERNATIONAL AIRLINES, S. A., Defendant-Appellant.**

No. 28773.

United States Court of Appeals, Fifth Circuit.

March 24, 1971.

Frederick A. Kullman, Andrew C. Partee, Jr., Kullman, Lang, Keenan, Inman & Bee, New Orleans, La., for TACA International Airlines, S. A.

C. Paul Barker, New Orleans, La., Robert S. Savelson, New York City, Cohen, Weiss & Simon, New York City, Dodd, Hirsch, Barker, Meunier, Boudreaux & Lamy, New Orleans, La., for appellee Air Line Pilots Association, International; Frank M. Aiello, Edward R. Curtin, New York City, of counsel.

Before RIVES, AINSWORTH and MORGAN, Circuit Judges.

AINSWORTH, Circuit Judge:

The Air Line Pilots Association, International (ALPA) and its President, Charles H. Ruby, filed this suit for an injunction under the Railway Labor Act, 45 U.S.C. § 151 et seq., on behalf of the pilots employed by defendant TACA International Airlines (TACA). The District Court held a hearing, rendered findings of fact and conclusions of law, and entered an order for a preliminary injunction restraining TACA from implementing any part of its program to transfer its New Orleans pilot base to El Salvador. TACA appeals, contending that the District Court lacked jurisdiction, that the injunction was overbroad, and that the order should be vacated on the ground that the underlying controversy is now moot. We affirm the order.

I. Background

TACA International Airlines, S. A., is incorporated under the laws of El Salvador. Its flights connect points on the Gulf Coast of the United States with points in Central America. Since approximately May of 1949, when TACA instituted service between New Orleans, Louisiana, and El Salvador, all pilots in its employ have been based at New Orleans. Almost all are citizens of the United States, domiciled in Louisiana.

On April 6, 1968, in accordance with the provisions of the Railway Labor Act ("the Act"), ALPA and TACA entered into a collective bargaining agreement governing the rates of pay, rules and working conditions of the TACA pilots. Section 30 of the agreement, titled "Duration," provides that the agreement will continue in full force and effect through December 31, 1969, and thereafter, unless written notice of intended change is served by either party at least 60 days prior to December 31, 1969, or thereafter, in accordance with Section 6 of the Act, 45 U.S.C. § 156.[1] No notice of pro-

---

1. Section 6 provides in pertinent part: "Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and

posed termination as such has been filed by either party.

TACA now seeks to transfer the New Orleans pilot base to San Salvador, El Salvador. The pilots contend, and the District Judge found, that if the base is transferred, Salvadorean law will bar ALPA from continuing to function as collective bargaining representative for the TACA pilots, and the TACA-ALPA agreement of April 1968 will be nullified. The pilots further contend that these consequences furnish the carrier's principal motive for the move. TACA maintains that the move has independent justifications; in particular, it points out, the Salvadorean government has requested that the move be made.

In April of 1969 TACA began recruiting and training pilots to replace those pilots then in its employ who might refuse to transfer to El Salvador. In letters to the pilots in June and July of 1969, TACA served notice that any incumbent pilot who refused relocation would be fired and replaced. None of the pilots signified consent to relocation. Instead, through ALPA, the pilots sought to have the carrier withdraw its demand, or give written notice of an intended change in rules and working conditions pursuant to Section 30 of the agreement and Sections 2 Seventh and 6 of the Railway Labor Act. TACA declined to change its position, and ALPA brought this suit.

The principal issue in the District Court was whether the pilot base controversy constituted a "major" or a "minor" dispute.[2] ALPA contended that it fell within the provisions of Sections 2 Seventh and 6 of the Act, 45 U.S.C. §§ 152, 156, and hence was subject as a "major" dispute to the jurisdiction of the District Court. TACA countered that the dispute was "minor" in that it turned on the interpretation to be given to certain provisions of the agreement, and that hence only a system board of adjustment established pursuant to 45 U.S.C. § 184[3] could assume jurisdiction. The District Judge concluded that the dispute was major, and further that the carrier's course of conduct constituted a refusal to bargain in good faith with ALPA and an attempt to "influence, interfere with and coerce its pilots in the exercise of their rights to ALPA collective bargaining representation, and the right of ALPA to represent said craft or class," in violation of Sections 2 and 6 of the Act. On the basis of these preliminary findings, the Judge ordered TACA to (1) withdraw its notice to the pilots conditioning future employment on acceptance of removal to El Salvador; (2) take no action in furtherance of removal until it filed a Section 6 notice; (3) suspend its pilot replacement program; and (4) do nothing to "in any way influence, interfere with or coerce TACA pilots in their choice of ALPA as their collective bargaining representative * * *."

From this order, which remains in effect "pending final determination of the action," TACA appeals.

place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice * * *."

2. For a capsule summary of the history and legal import of the "major"–"minor" distinction under the Railway Labor Act, see Seaboard World Airlines, Inc. v. Transport Workers Union, 2 Cir., 1970, 425 F.2d 1086, 1089–1090. A more exhaustive treatment will be found in Harper, Major Disputes Under the Railway Labor Act, 35 J.Air L. & Com. 3 (1969).

3. Section 184 of 45 U.S.C. provides in pertinent part:

The disputes between an employee or group of employees and a carrier or carriers by air growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, * * * shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to an appropriate adjustment board * * *.

## II. Mootness

■ On October 27, 1969, subsequent to the rendering of the judgment of the District Court, TACA and ALPA each filed with the other a Section 6 notice respecting the proposed pilot base relocation. In response to this Court's query as to the legal significance of that exchange, TACA filed a post-argument brief in which it takes the position that this case is now moot.

The thrust of TACA's argument is that with the exchange of Section 6 notices the dispute, whatever it had been before, became a major dispute; that at that point TACA became bound under Section 6 to preserve the status quo on pilot base location; and that TACA firmly intends to respect its obligation under the Act. TACA argues that there is now an "absolute want of present actuality" in the controversy adjudicated below, United States v. Hamburg-American S. S. Co., 239 U.S. 466, 475, 36 S.Ct. 212, 216, 60 L.Ed. 387 (1916). Hence, it concludes, the District Court order should be vacated, and the appeal dismissed.

We disagree. Though the parties apparently agree that the pilot-base dispute is now a major dispute, TACA does not suggest that a consensus exists as to the consequences—i. e., the specific constraints to which TACA would be legally subject if the injunction were dissolved. Cf. United States v. W. T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); Walling v. Helmerich & Payne, 323 U.S. 37, 42–43, 65 S. Ct. 11, 14–15, 89 L.Ed. 29 (1944); United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416, 448. Moreover, the carrier's argument conveniently ignores the fact that the injunction was designed not only to particularize TACA's Section 6 obligations, but to curtail its interference with ALPA's representation of the pilots and to put an end to its refusal to bargain in good faith. TACA has not borne its burden of showing that "there is no reasonable expectation that [these wrongs] will be repeated," United States v. W. T. Grant Co., supra, 345 U.S. at 633, 73 S.Ct. at 897. It has not expressly or implicitly abandoned its original objections to the District Court order.[4] We hold that a justiciable controversy remains.

## III. District Court Jurisdiction

TACA contends that the pilot-base controversy, as it stood in the court below, was a minor dispute over which the District Court had no jurisdiction. We hold that the Court had jurisdiction over the dispute and the power to grant the pilots injunctive relief.

■ It has been generally held that the special boards of adjustment provided for in the Railway Labor Act have "exclusive jurisdiction" over minor disputes. See, e. g., International Ass'n of Machinists v. Eastern Airlines, Inc., 5 Cir., 1963, 320 F.2d 451; Hilbert v. Pennsylvania Railroad Company, 7 Cir., 1961, 290 F.2d 881, cert. denied, 368 U. S. 900, 82 S.Ct. 174, 7 L.Ed.2d 96 (1961); cf. Order of Railway Conductors v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed.2d 318 (1946). The Act does not in terms require carriers to maintain the status quo pending resolution of minor disputes. A federal court may impose such a requirement as a condition to an injunction restraining a union from striking a carrier, see Brotherhood of L. E. v. Missouri-Kansas-T. R. Co., 363 U.S. 528, 534, 80 S.Ct. 1326, 1330, 4 L.Ed.2d 1379 (1960); Piedmont Aviation, Inc. v. Air Line Pilots Ass'n, Internat'l, 4 Cir., 1969, 416 F.2d 633, cert. denied, 397 U.S. 926, 90 S.Ct. 924,

4. TACA is careful to concede no more in its post-argument brief than that the dispute has been a major dispute since the exchange of Section 6 notices. Its notice to ALPA provides: "This notice is given with full reservation of the company's position heretofore taken * * * The giving of this notice shall not be construed as any acquiescence in the findings of the District Court, nor any abandonment of the appeal heretofore taken by TACA from the preliminary injunction granted by the United States District Court."

25 L.Ed.2d 105 (1970); or where otherwise necessary to preserve the jurisdiction of a board of adjustment over a minor dispute already submitted to it, see Southern Ry. Co. v. Brotherhood of Locomotive Fire. & Eng., 1967, 127 U.S. App.D.C. 371, 384 F.2d 323; Westchester Lodge 2186, Etc. v. Railway Express Agency, Inc., 2 Cir., 1964, 329 F.2d 748. In the instant case, neither of these exceptions applies; thus the jurisdiction of the District Court depends in part on whether the pilot-base controversy is a minor or a major dispute.

This Court has held that a dispute is a major dispute if it concerns an action by a carrier which (1) falls within the class defined in Section 2 Seventh or Section 6 of the Act, and (2) is not arguably authorized by the existing agreement between the parties. See United Indus. Wkrs. of Seafarers, Etc. v. Board of Trustees, 5 Cir., 1965, 351 F.2d 183, 188–192 (the "Galveston Wharves case"); cf. International Bhd. of Teamsters v. Braniff Internat'l Airways, Inc., 5 Cir., 1971 437 F.2d 1272; Railway Express Agency, Inc. v. Brotherhood of Railway Clerks, 5 Cir., 1971, 437 F.2d 388.[5] The proposed pilot base relocation, which would terminate in its entirety the existing TACA-ALPA agreement governing rules, rates of pay, and working conditions, falls within the class of carrier actions defined in Section 2 Seventh.[6] TACA contends, however, that the transfer is authorized by provisions in the agreement that delineate conditions under which pilots may be transferred from one base to another and specify the effect to be given to the law of El Salvador.

■ In the Galveston Wharves case, supra, this Court reviewed a Railway Labor Act agreement against a factual background similar to that in the instant case, and held that a major dispute existed:

> [T]here is absolutely nothing about the Agreement, or more fundamentally, about the * * * role of collective bargaining agreements in assuring industrial peace, which contemplates that during the term the employer has the right [unilaterally] to bring it all to an end * * *.

351 F.2d at 189. We reach the same conclusion here. The record of the negotiations leading to the April 1968 agreement reflects a deep concern on the part of the pilots, based on the past experience of TACA's stewardesses and dispatchers,[7] that if given the opportuni-

---

**5.** Decisions of this Court prior to the Galveston Wharves decision appear to hold that a contention by the carrier that its proposed action is authorized by an existing agreement automatically divests a federal district court of jurisdiction. See Aaxico Airlines, Inc. v. Air Lines Pilots Ass'n, Internat'l, 5 Cir., 1964, 331 F.2d 433, cert. denied, 379 U.S. 933, 85 S.Ct. 333, 13 L.Ed.2d 344 (1964); St. Louis, S. F. & T. Ry. Co. v. Railroad Yardmasters of America, 5 Cir., 1964, 328 F.2d 749, cert. denied, 377 U.S. 980, 84 S.Ct. 1886, 12 L.Ed. 748 (1964); Brotherhood, Etc. v. Central of Georgia Ry. Co.. 5 Cir., 1952, 199 F.2d 384, cert. denied, 345 U.S. 908, 73 S.Ct. 648, 97 L.Ed. 1344 (1953). These cases are cited and distinguished without discussion in this Court's opinion in the Galveston Wharves case, 351 F.2d at 188 n. 23, in which we held that it lies within the province of the court to determine whether the carrier's claimed contract justification is wholly spurious. See Harper, supra n. 2, at 12–22. The rule of Galveston Wharves has been followed or cited with approval in at least three other Circuits. See Airlines Stewards & S. Ass'n, Loc. 550 v. Caribbean Atl. A., Inc., 1 Cir., 1969, 412 F.2d 289, 291; Switchmen's Union of North America v. Southern Pacific Co., 9 Cir., 1968, 398 F.2d 443, 447; Southern Ry. Co. v. Brotherhood of Locomotive Fire & Eng.. 1967, 127 U.S.App.D.C. 371, 384 F.2d 323, 327. In Seaboard World Airlines, Inc. v. Transport Workers Union, 2 Cir., 1970, 425 F.2d 1086, 1090–1091, the Second Circuit, without citing the Galveston Wharves case, applied a similar procedure.

**6.** Section 2 Seventh provides: "No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in [section 6]."

**7.** On July 13, 1966. the TACA stewardesses notified TACA's General Manager

ty the carrier would use the runaway shop technique to defeat the pilots' collective bargaining gains. The record further indicates that in 1966 and again in March of 1968, the President of TACA formally assured the pilots that TACA had no intention of relocating the pilot base. There is no evidence, and indeed no claim, that any provision of the existing agreement conflicts with Salvadorean law. The agreement might be read to authorize TACA to transfer individual pilots ad hoc without further negotiations with ALPA. Cf. International Bhd. of Teamsters v. Braniff Internat'l Airways, Inc., 5 Cir., 1971, 437 F.2d 1272. It cannot reasonably be read to authorize a full-scale unilateral transfer, with the attendant consequences for ALPA and the agreement as a whole.

The dispute was and is a major dispute. Hence, the District Court had both jurisdiction over the dispute, and the power to enjoin the carrier at least temporarily from disturbing the status quo. Detroit & Toledo S. L. R. Co. v. United Transp. U., 396 U.S. 142, 90 S. Ct. 294, 24 L.Ed.2d 325 (1969); United Indus. Wkrs. of Seafarers, Etc. v. Board of Trustees, 5 Cir., 1965, 351 F.2d 183.

■ The Railway Labor Act furnishes a second jurisdictional basis for the order of the lower court. The District Judge found, and did not err in finding, that the carrier's conduct constituted a patent violation of Section 2 Fourth of the Act, 45 U.S.C. § 152. Conduct in violation of Section 2 Fourth is subject to restraint by federal court injunction, regardless of whether such conduct also generates a major dispute. See Brotherhood of Railroad Train. v. Central of Ga. Ry. Co., 5 Cir., 1962, 305 F.2d 605, 607–609, and cases cited therein.

IV. Scope of the Injunction

TACA contends that the order of the District Court is "too broad." The sole error specifically alleged is that in enjoining TACA from recruiting and training replacement pilots, the Court denied the carrier its right to preserve its bargaining power against the threat of a pilots' strike.

■ The District Judge found that the pilot replacement program was "commenced and has been carried on by TACA in bad faith for purposes of undermining * * * its collective bargaining relations with ALPA." The record shows that the carrier, rather than discuss with ALPA its change of position on pilot base relocation, dealt directly with the individual pilots by means of threats. The credibility of the threats was assured by the pilot replacement program, instituted several weeks previously without prior notice to ALPA or the pilots.

"[T]he unquestioned right to resort to self-help is the inevitable alternative in a statutory scheme which deliberately

that they had formed the TACA Stewardesses Association "to improve the relations between our department head and ourselves * * *." On August 23, 1966, a TACA official wrote to the stewardesses in reference to "the forthcoming transfer of the Passenger Service Department to * * * San Salvador," and served notice that "If your intentions are contrary to the best interests of the Company it should be known now that the Company will not give any stewardesses who take this attitude favorable references for obtaining other employment." TACA's stewardesses are now based in El Salvador.

As to the termination of TACA's dispatchers, Captain Huttinger, a TACA pilot and the chairman of ALPA's Master Executive Council, testified as follows:

Q Was the [Airline] Dispatchers Association certified by the Mediation Board or recognized by the property? A Yes, they had to act. They were certified shortly after that. I think they presented an opener to the company. In fact, I am sure they did present an opener to the company. The company then notified the dispatching office that they would be closing that office in New Orleans, and the company then contracted the work to some other firm in Miami. I registered a strong complaint as far as a safety factor of the flights was concerned, but it did no good.

denies the final power to compel arbitration" of major disputes. Florida East Coast Ry. Co. v. Brotherhood of R. Trainmen, 5 Cir., 1964, 336 F.2d 172, 181, cert. denied, 379 U.S. 990, 85 S.Ct. 703, 13 L.Ed.2d 611 (1965). But the case before us differs from *Florida East Coast* and the others cited by appellant in the important respect that the disputants have not yet "exhausted all of the elaborate governmental machinery" of Section 6. See id., 336 F.2d at 181; cf. Atlanta & West Point Ry. Co. v. United Transp. Union, 5 Cir. 1971, 439 F.2d 73.

In the first Supreme Court opinion affirming an injunction under the Railway Labor Act directed to a carrier's refusal to bargain in good faith with the duly authorized representative of its employees, the Court noted that "the extent to which equity will go to give relief where there is no adequate remedy at law * * * rests * * * in the sound discretion of the court." Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 551, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937). We hold that the District Judge did not abuse his discretion in the instant case.

Affirmed.