**INTERNATIONAL BROTHERHOOD OF FIREMEN & OILERS, Plaintiff,**

v.

**CONSOLIDATED RAIL CORPORATION, Defendant.**

No. C–2–82–1145.

United States District Court, S.D. Ohio, E.D.

Dec. 30, 1982.

N. Victor Goodman, Columbus, Ohio, Edward J. Hickey, Jr., Washington, D.C., for plaintiff.

Gregory Scott and John B. Lewis, Columbus, Ohio, for defendant.

## MEMORANDUM AND ORDER

DUNCAN, District Judge.

This action is brought by the International Brotherhood of Firemen & Oilers (IBFO) against Consolidated Rail Corporation (Conrail) under the Railway Labor Act (RLA), 45 U.S.C. §§ 151 *et seq.* IBFO claims that Conrail has abolished the positions held by certain laborers it represents and has transferred the work normally done by them to other employees. By so doing, according to IBFO, Conrail has unilaterally changed the

terms and conditions of employment for IBFO laborers without first exhausting the mandatory procedures set forth in Section 6 of the RLA, 45 U.S.C. § 156. To redress this alleged violation, IBFO seeks an injunction compelling Conrail to reestablish the abolished jobs and to restore the *status quo ante* as it existed prior to the layoffs, at least until such time as Conrail resorts to the procedures outlined in the RLA. The union also seeks an award of back pay, lost benefits and attorneys' fees.

Currently before the Court is IBFO's motion for a preliminary injunction. Also pending is a motion by Conrail to dismiss the complaint for lack of subject matter jurisdiction. The Court has thoroughly reviewed the pleadings on each of these motions, as well as the evidence adduced at the preliminary injunction hearing. For reasons set forth more fully below, the Court finds that it has jurisdiction over this matter, but that injunctive relief is not available to the union at this time. The Court also finds that further action in this case must be stayed pending the commencement of administrative proceedings under the minor dispute provisions of the RLA.

## I

The relevant facts are largely undisputed. Defendant Conrail is a rail carrier doing business within the State of Ohio and as such, is subject to the terms and conditions of the Railway Labor Act. Plaintiff IBFO is an unincorporated labor organization which represents Conrail's maintenance department laborers, power plant employees, motor equipment operators, fuel truck drivers and hostler helpers. It too is subject to the provisions of the RLA. A collective bargaining agreement between the railroad and the union, effective as of April 1, 1976, governs the terms and conditions of employment for Conrail's IBFO members. This agreement incorporates by reference the International Agreement of September 25, 1964, as amended. IBFO is also a party

to a collective bargaining agreement with Conrail entitled "Agreement Between Conrail and Certain Labor Organizations for Labor Contributions to Self Sufficiency for Conrail," dated May 5, 1981.

On December 5, 1980, IBFO, pursuant to Section 6 of the RLA, 45 U.S.C. § 156, served on Conrail a notice of its desire to revise, amend and supplement the provisions of the 1976 collective bargaining agreement. The union proposed an amendment which would give IBFO laborers exclusive rights to perform the work described in the 1976 agreement. According to IBFO, this proposal was intended simply to confirm in writing Conrail's historical practice of assigning certain work only to employees represented by the union. Following the proposal some discussions took place between the parties, but to date Conrail has not agreed to the change, and the current vitality of IBFO's Section 6 notice is subject to some speculation.[1]

Approximately a year and a half later, on June 30, 1982, Conrail abolished the positions of four laborers represented by IBFO at the Caboose Track in Selkirk, New York. The railroad claims that these job eliminations were necessitated by the fact that rail traffic at Selkirk has diminished to the point that it can no longer justify employment of the affected workers. By virtue of their seniority within the union, these laborers were able to "bump" more junior employees and obtain other positions with Conrail, but Frank D. Varcasia, one of the four, testified that the elimination of the positions eventually resulted in the layoff of four junior IBFO laborers.

Prior to Conrail's action, laborers working at the Selkirk Caboose Track were generally responsible, *inter alia,* for cleaning sinks, sweeping out cabooses, and bagging ice. Since June 30, though, these tasks have been performed by carmen whose craft is not represented by IBFO. Varcasia testified that up until June 1982, this type of work was performed exclusively by IBFO laborers.

---

1. Conrail claims that the notice was effectively withdrawn when IBFO entered into the May 5, 1981 agreement. Because the Court believes that Section 6 of the RLA is inapplicable to this dispute, the validity of Conrail's contention need not be addressed here.

On July 7, 1982, Conrail abolished another laborer's position, this time at the Ashtabula Old Shop in Ashtabula, Ohio. The abolished job was the only position represented by IBFO at this particular location.

On August 19, 1982, four laborers' positions were abolished at the Buckeye Cabin Track in Columbus, Ohio. Several of the affected employees testified that prior to the abolition of their jobs, IBFO laborers were generally responsible for cleaning and maintaining train cabins, washing windows, sacking ice, servicing "fusees" or flares, and "E-cleaning" batteries. Although some of this work was occasionally shared with carmen or electricians, most of it was considered by the laborers to be within their exclusive province. After their jobs were abolished, though, this work was taken over by other employees, none of whom are represented by IBFO.

The union filed its lawsuit on September 17, 1982. The complaint was accompanied by a motion for a temporary restraining order which would block further elimination of laborers' positions and generally restore the *status quo ante* as of July 1, 1982. The Court, after meeting with counsel for both parties, denied the motion but granted IBFO leave to renew its request for injunctive relief upon notice by Conrail that further job eliminations were anticipated. Subsequent to the order denying the TRO, but prior to the preliminary injunction hearing, Conrail notified the Court and IBFO that it had eliminated another laborer's position at the Big Four Yard in Avon, Indiana. IBFO chose not to renew its motion for a TRO.

On November 8, 1982, the Court held a hearing on IBFO's request for preliminary injunctive relief. Since then the Court has been notified of further job eliminations by Conrail, some of which are quite extensive in scope. Late in November the railroad announced a systemwide "force reduction" of 79 employees at various locations in 5 states. Of these 79, 14 were represented by IBFO. Another force reduction was undertaken in late December. This time 546 Conrail employees were laid off, 23 of whom were IBFO members. The affected IBFO laborers were all employed in Pennsylvania, and in at least one instance the reductions have resulted in the loss of the only remaining IBFO positions at a particular site. In addition to these job eliminations, Conrail has notified the Court of "sporadic" layoffs in Columbus, Ohio; Selkirk, New York; Syracuse, New York; Bethlehem, Pennsylvania; Jackson, Michigan and Lansing, Michigan. At the two Michigan locations, these job eliminations have affected the last IBFO worker at each site.

Upon receiving notice of these actions by the railroad, IBFO indicated its desire to renew the motion for a temporary restraining order. It has refrained from doing so, however, on the basis of assurances from the Court that a ruling on the preliminary injunction was forthcoming. In light of these events, the Court has made every effort to expedite its consideration of the case.

## II

As a threshold matter, the Court must determine whether this is a "major" dispute or a "minor" dispute for purposes of the RLA. This distinction is important, for the Act sets up different procedures for resolution of each type of controversy, and these procedures have some impact on the remedies available to litigants in the federal courts.

■ Under the pertinent statutes, "[t]he first step toward settlement of either kind of dispute is negotiation and conference between the parties. Thereafter, procedures for major and minor disputes diverge." *Ashley, Drew & Northern Ry. Co. v. UTU*, 625 F.2d 1357, 1368 (8th Cir.1980). In a major dispute, the next step is conciliation by the National Mediation Board. 45 U.S.C. § 156. Prior to the completion of the conciliation stage, the carrier is expressly prohibited from changing the "rates of pay, rules or working conditions" of its employees, and the district courts are empowered to enjoin the carrier from doing so. *Detroit & Toledo Shore Line R.R. Co. v.*

*UTU,* 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969).

In a minor dispute, the parties proceed directly to "final and binding" arbitration by the National Railroad Adjustment Board. 45 U.S.C. § 153 First (i) and (m). The "status quo" provision of Section 156 does not apply to minor disputes, however, and there is no provision of the RLA expressly forbidding carriers from engaging in the contested action prior to, or during the course of arbitration proceedings. This leaves the courts without direct statutory authority to enjoin the challenged activity, thereby limiting both the circumstances upon which such a remedy will issue and to a lesser extent, the scope of relief which can be granted. *Compare Detroit & Toledo Shore Line R.R. Co. v. UTU, supra,* and *Bhd. of Railroad Trainmen v. Chicago River & Indiana R.R. Co.,* 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). *See also, Bhd. of Locomotive Engineers v. Missouri-Kansas-Texas R.R. Co.,* 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1435 (1960); *Ruby v. TACA International Airlines, S.A.,* 439 F.2d 1359 (5th Cir.1971). At the outset, therefore, the Court must define the instant controversy as "major" or "minor."

■ The rule for distinguishing the two types of dispute is well established. Major disputes relate generally to

the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

[A minor dispute], however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is

founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, e.g., claims on account of personal injuries. In either case the claim is to rights accrued, not merely to have new ones created for the future.

*Elgin, Joliet & Eastern Ry. Co. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886 (1945). Major disputes present "the large issues about which strikes ordinarily arise," whereas minor controversies involve only "the smaller differences which inevitably appear in the carrying out of major agreements and policies." *Id.,* 325 U.S. at 724, 65 S.Ct. at 1290.

As a practical matter, of course, this distinction often breaks down, and the courts have been quick to eschew rigid formalities in favor of a more pragmatic approach. *See, e.g., Rutland Ry. Co. v. Bhd. of Locomotive Engineers,* 307 F.2d 21, 33–34 (2d Cir.1962); *United Industrial Workers v. Board of Trustees of Galveston Wharves,* 351 F.2d 183, 188–190 (5th Cir.1965). It is incumbent upon this Court, therefore, to examine the present dispute not only by way of the formula set forth in *Elgin Joliet,* but also through the "ordinary glasses" of common sense. *Id.,* 351 F.2d at 189.

Viewed either way, the controversy at hand is difficult to categorize, for it exhibits both "major" and "minor" qualities, and the parties have each advanced plausible theories to support their respective characterizations. Where such uncertainty is present, however, the rule in this circuit appears to compel a "minor" finding. The Sixth Circuit has declared that:

if the disputed action of one of the parties can "arguably" be justified by the existing agreement or, in somewhat different statement, if the contention that the labor contract sanctions the disputed action is not "obviously insubstantial," the controversy is within the exclusive province of the National Railroad Adjustment Board.

*Local 1477, UTU v. Baker,* 482 F.2d 228, 230 (6th Cir.1973). *See also, Carbone v. Meserve,* 645 F.2d 96, 98 (1st Cir.), *cert. denied,*

454 U.S. 859, 102 S.Ct. 312, 70 L.Ed.2d 156 (1981). So long as Conrail can point to a particular term in the collective bargaining agreement which reasonably provides "arguable" justification for the IBFO job eliminations and work reassignments, then, this Court must deem the controversy at hand to be a minor one.

IBFO alleges that the collective bargaining agreement involved here does not envision changes in the terms and conditions of employment as significant as those wrought by Conrail's actions. The union points specifically to the "scope rule" of the 1976 agreement, which, according to IBFO, effectively precludes Conrail from reassigning work formerly done by laborers to those in other crafts. In addition, IBFO contends that its members have an implied contractual right to the work at issue by virtue of past practices between itself and the railroad, and that it has actively sought to reduce these practices to writing since 1980 when it served its Section 6 notice.

The strength of this position is undermined somewhat by the terms of the 1976 agreement, however. The elimination of laborers' positions is covered by Rule 11 of the agreement, which states in pertinent part that:

(a) Notice of force reduction or abolishment of position at any point or in any department shall be posted or given as soon as possible and not less than five (5) working days in advance, except no advance notice to employees shall be required before temporarily abolishing positions or making temporary force reductions under emergency conditions, such as flood, snow storm, hurricane, tornado, earthquake, fire or labor dispute other than as covered in paragraph (b) below, provided that such conditions result in suspension of the Company's operations in whole or in part. It is understood and agreed that such temporary force reductions will be confined solely to those work locations directly affected by any suspension of operations. It is further understood and agreed that notwithstanding the foregoing any employee who is affected by an emergency force reduction and reports for work for his position without having been previously notified not to report, shall receive four (4) hours pay at the applicable rate for his position . . . .

(c) When forces are reduced, senior employees per paragraph (a) of Rule 9 capable of doing the work will be retained.

Nothing in the contract prohibits Conrail from laying off IBFO laborers at locations in which rail traffic has dwindled appreciably. A possible inference from this language is that Conrail has the right to make permanent force reductions when in good faith it determines that further retention of such forces is not economically feasible, provided of course that the procedures outlined in Rule 11 and elsewhere in the agreement are followed completely. There is thus a plausible basis in the collective bargaining agreement for Conrail's abolition of the jobs in question.

The contract also deals with reassignment of IBFO work to other employees. The agreement first states the various employee classifications involved in the contract; it provides further that:

The listing of these classifications in no manner obligates the Company to assign work contemplated by said classifications to employees represented by the I.B.F. & O. where such work has been performed by others either under agreements with other labor organizations or by past practice; neither shall the Company, by virtue of said classifications, take any work not contemplated thereby away from employees represented by the I.B.F. & O. where such work has been performed under agreements with the I.B.F. & O. or by past practice.

Without limiting the exceptions contained in the previous paragraph, no work contemplated by the above classifications will be assigned to a position not covered by this Agreement when such work would constitute the major portion of that position.

This "scope rule" does not define with any specificity the type of work, if any, over which the union has exclusive control. It is not clear from the face of the contract that Conrail is prohibited from reassigning the tasks at issue to other employees.

It appears from the testimony elicited at the hearing, moreover, that some tasks listed under the various job classifications were performed exclusively by IBFO members while others were not. It is thus possible to argue that because the "scope rule" fails to grant exclusive entitlement to specific jobs, Conrail was within its rights in reassigning the work formerly done by IBFO laborers to other employees, at least to the extent that such work had not been expressly reserved by other agreements or past practice.[2] Conrail's chief negotiator testified that this was the gist of the agreement reached by the parties in 1976, and the union's subsequent attempts to strengthen the scope rule's exclusivity clauses adds credence to this view. Based on these factors, the Court cannot say that Conrail's contentions concerning its reassignment rights under the collective bargaining agreement are "obviously insubstantial."

This same conclusion was reached recently by another court in *IBFO v. Atchison, Topeka & Santa Fe Ry. Co.*, No. 82–4193, Memorandum and Order (D.Kan., October 6, 1982), a case involving IBFO and a different carrier. There, on facts almost identical to those at hand, the court held squarely that a dispute between the union and the railroad over job eliminations and work reassignment was minor in nature. Although the terms of the collective bargaining agreement in that case did not mirror those involved here word for word, the two contracts were structured similarly, and in both cases there was evidence that IBFO

had attempted to negotiate more specific exclusivity rights. The Court thus finds Judge Rogers' analysis highly persuasive.

The controversy between IBFO and Conrail is also "minor" in a less formal sense. As was suggested by the Supreme Court in the *Elgin Joliet* case, *supra,* major disputes arise out of employment changes which have a direct effect on all or most of the members of a particular labor organization—changes which are reasonably likely to foment a strike or other interruption of rail service. Minor disputes, by contrast, normally revolve around changes that affect only particular individuals within the union, even if, as here, the effect on such persons is drastic. This latter type of controversy may be aggravated to such an extent that a general work stoppage results, but under normal circumstances the impact of the employer's action is not such as to pose an immediate threat to the majority of union members or to the union itself. *Id.*

■ Seen from this perspective, the current disagreement takes on less monumental proportions. On the basis of actions taken by Conrail subsequent to the filing of the complaint in this case, it appears as though the number of IBFO-represented jobs eliminated by the railroad's force reductions may be greater than originally expected. Still, there is no evidence that the job eliminations have affected a majority, or even a significant minority, of Conrail's IBFO laborers, and the Court has no reason to believe that work has been taken away from those laborers who remain.[3] Nor has it been shown that the union's continued presence at Conrail is somehow jeopardized by the eliminations, or that a strike over the matter is anticipated by either side. Examined through "ordinary glasses," then, this controversy is minor in nature. It

2. The Court, of course, takes no position on the relative merits of this, or any other argument regarding the proper interpretation of the contract. The terms of the collective bargaining agreement are considered herein only for the purpose of classifying the present controversy under the RLA, and only to the extent necessary to accomplish this limited end.

3. The Court has heard no evidence whatsoever concerning the total number of IBFO positions currently existing at Conrail. If, at some future stage in these proceedings the question of injunctive relief arises anew, such evidence would be useful in trying to determine the impact of Conrail's actions on union membership as a whole.

must therefore proceed through the minor dispute mechanism laid out in the RLA.

### III

Since this is a minor dispute, the Court must next consider the scope of its own power over the matter. Conrail argues in its motion to dismiss that since the RLA gives the Court no direct authority to act in such disputes, the Court is without subject matter jurisdiction to grant any relief whatsoever to the union. The railroad acknowledges the Court's traditional authority to fashion equitable remedies, but it argues that the use of such power here is foreclosed by the statutes which bestow upon the Adjustment Board "exclusive jurisdiction" to decide these cases.

This argument is not without support in the case law. The Supreme Court has repeatedly held that the Adjustment Board has sole authority to determine the merits of minor disputes, and attempts by the courts to encroach upon this authority have consistently been rebuffed. *See Gunther v. San Diego & Arizona Eastern Ry.*, 382 U.S. 257, 86 S.Ct. 368, 15 L.Ed.2d 308 (1965); *Andrews v. Louisville & Nashville R.R.*, 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972); and *Union Pacific R.R. v. Sheehan*, 439 U.S. 89, 99 S.Ct. 399, 58 L.Ed.2d 354 (1978). At least one judge has interpreted these rulings to mean that the lower courts are deprived of subject matter jurisdiction over requests for injunctive relief as well. *Local Lodge No. 76, Railroad Yardmasters of America v. Conrail*, No. 81–2033, Memorandum Opinion (W.D.Pa. September 14, 1982). A similar approach has been suggested in *dicta* by the Sixth Circuit. *See Local 1477, UTU v. Baker, supra*, 482 F.2d at 230–31.

These latter two cases must be contrasted with earlier decisions of the Supreme Court, however. In *Bhd. of Railroad Trainmen v. Chicago River & Indiana R.R. Co.*, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957), the Court specifically held that federal courts retain limited equitable jurisdiction over minor disputes pending before the Adjustment Board. The holding was reaffirmed a few years later in *Bhd. of Locomotive Engineers v. Missouri-Kansas-Texas R.R. Co.*, 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1435 (1960). There the Court approved a district court order forbidding the union to go out on strike and requiring the carrier to restore the *status quo ante* pending resolution of the dispute by the Adjustment Board. The Court indicated that despite the RLA's delegation of authority to the Adjustment Board, the federal courts have inherent equitable powers to intervene in such matters. 363 U.S. at 533–535, 80 S.Ct. at 1329–1330. In subsequent decisions the Supreme Court has emphasized the need for exhaustion of administrative proceedings in RLA cases, but nothing in these later opinions has cast doubt on the continued validity of *Chicago River* or *Missouri-Kansas-Texas. See, e.g., Union Pacific R.R. v. Sheehan, supra.* This Court must assume, therefore, that although it has no subject matter jurisdiction to determine the merits of IBFO's claims under the collective bargaining agreement, it does have inherent authority to restore the *status quo ante* in this case, provided that IBFO meets the traditional standards for equitable relief.

It has also been argued that the Court may exercise this authority only under limited procedural circumstances, none of which are present here. In *Ruby v. TACA International Airlines*, 439 F.2d 1359 (5th Cir.1971), the Fifth Circuit intimated that a district court may not require a carrier to cease and desist from a disputed action unless such an order is issued (a) as a condition to an injunction restraining the union from striking, or (b) "where otherwise necessary to preserve the jurisdiction of a board of adjustment over a minor dispute *already submitted to it*." (Emphasis added.) 439 F.2d at 1363. *See also, Missouri-Kansas-Texas*, 363 U.S. at 528 n. 3, 80 S.Ct. at 1329 n. 3. Since there is no strike involved in the present suit, this would seem to suggest that IBFO is precluded from moving for preliminary injunctive relief until it has first filed a formal complaint with the Adjustment Board. Apparently, IBFO has not taken such a step, so if resort to the

Adjustment Board is truly a procedural prerequisite to maintenance of an equitable action in the district court, this case must be dismissed outright.

Lacking direct authority from the RLA or more explicit pronouncements from the courts above, however, this Court is simply not willing to erect such a procedural hurdle for unions seeking temporary equitable remedies. Nothing in the statute compels such a requirement, and the Court believes that to create one here would serve no useful purpose. The Adjustment Board has no statutory authority to grant injunctions during the pendency of actions before it, so a rule requiring those seeking injunctive relief to go there initially would be of little value and could potentially lead to harmful delays in emergency situations.[4] Allowing unions to proceed directly to the district courts in minor disputes does not in any way conflict with the aims of the RLA, moreover, because, as was explained above, the courts' authority over such matters is limited to determining whether or not an injunction is appropriate while the case is being determined on its merits by the Adjustment Board. Court intervention, therefore, does not interfere with the Adjustment Board's "exclusive" jurisdiction over minor disputes. In fact, in cases in which an injunction issues, court intervention actually helps to preserve the Adjustment Board's power by "freezing" the situation until the dispute can be fairly adjudicated and resolved.

▪ Accordingly, the Court holds that IBFO's failure to submit this matter to the Adjustment Board prior to filing for injunctive relief is not fatal to its efforts here. Subject to the limitations inherent in its equitable powers generally, this Court has jurisdiction to enjoin Conrail from engaging in the contested activity and to impose such conditions on the litigants as will adequately preserve the dispute for adjudication on its merits by the Adjustment Board. On this basis, Conrail's motion to dismiss for lack of subject matter jurisdiction must be denied.

## IV

Having determined that it has the power to act in this controversy, the Court must next consider whether its power should be exercised on these facts. Since the RLA does not give the courts special authority to maintain the *status quo* in minor disputes, the instant case is governed by the same equitable considerations that apply to any case in which a litigant seeks injunctive relief. *See Missouri-Kansas-Texas, supra.* In general, such relief will not issue unless the applicant shows: (1) that it has a strong or substantial likelihood of success on the merits; (2) that irreparable injury will result if the injunction is not granted; (3) that others will not suffer substantial harm if the injunction is granted; and (4) that the public interest will be served by such an order. *Mason County Medical Assn. v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977); *Carson v. International Harvester Co.,* No. C–2–81–1283, Memorandum and Order (S.D.Ohio, March 24, 1982) (Duncan, J.). The burden of proof is on the moving party, so IBFO must meet each of these four criteria before the requested injunction will issue. *Id.*

▪ Assuming that the first, third and fourth parts of the *Mason County* test have been satisfied here, the Court is hardpressed to find that the harm occasioned by Conrail's actions is truly irreparable. The only real injury suffered by the union to date is the loss of a modest number of

---

4. In situations in which the parties disagree as to the proper characterization of the dispute, for instance, such a requirement would create considerable confusion. If the union felt that the dispute was major and took steps to submit the matter to the Mediation Board, but the Court to which the union turned for injunctive relief classified the controversy as minor, then the union might be barred from an injunction to which it was otherwise entitled, at least for the period of time necessary to re-file its complaint with the Adjustment Board. In this case, a strict exhaustion rule would only result in needless delay, for as soon as IBFO drafted a new complaint and sent it to the Adjustment Board, the parties could simply come back to this Court and demand the injunctive remedy prayed for originally.

laborers' positions. Certainly those IBFO members who have been laid off as a result of the railroad's job eliminations will suffer hardship, especially in view of current economic conditions, but it is well established in this circuit and elsewhere that the mere loss of potential income is ordinarily not grounds for preliminary injunctive relief. *Id.; see also, Sampson v. Murray*, 415 U.S. 61, 89–91, 94 S.Ct. 937, 952–953, 39 L.Ed.2d 166 (1974); *EEOC v. Anchor Hocking Corp.*, 666 F.2d 1037 (6th Cir.1981). In addition, there is no reason why the affected workers cannot obtain adequate redress for their injuries, including reinstatement and back pay, by pursuing their remedies under the RLA and the collective bargaining agreement. *Accord, IBFO v. Atchison, Topeka & Santa Fe Ry., supra*, at 14. If the Adjustment Board ultimately finds in favor of IBFO, it has full authority to make the aggrieved laborers whole. See 45 U.S.C. § 153 First (m) through (p). The union's remedy at law thus appears adequate.

While the Court sympathizes with IBFO laborers who have lost their jobs, temporarily or otherwise, it must nonetheless deny the union's application for a preliminary injunction. At this point in the proceedings, there is no evidence that a high percentage of IBFO laborers at Conrail have been directly affected by the railroad's force reductions and work reassignments, and the rights of those who have been harmed are adequately protected by the RLA's minor dispute procedures. There is nothing on the record as it now exists, moreover, to show that the union's continued presence at Conrail is in any way threatened, or that the present dispute will lead to major unrest among the union's rank and file. Under these circumstances, intervention by the Court at this time would be inappropriate.

On the other hand, the Court is keenly aware of the relatively large number of IBFO positions Conrail has abolished in the weeks following the preliminary injunction hearing, and it cannot foreclose the possibility that the harm suffered by IBFO and its members may rise in the foreseeable future to the level required to trigger the Court's equitable powers. If, for example, the job eliminations and work reassignments continue to the point that the union's very existence at Conrail is seriously threatened, or if the Adjustment Board's ability to achieve a just result in this controversy is in any way jeopardized, the harm occasioned by Conrail's force reductions may well become "irreparable" under the *Mason County* formula, and an injunction may be warranted. Should it appear at some future point that this is the case, IBFO will be granted leave to renew its request for preliminary injunctive relief, and the Court will not hesitate to intervene.

## V

For the reasons outlined above, defendant Conrail's motion to dismiss for lack of subject matter jurisdiction is DENIED. Plaintiff IBFO's motion for a preliminary injunction is likewise DENIED. Because the Court remains concerned about the effects of continued unilateral actions by Conrail, further proceedings in this case shall be STAYED pending resolution of the merits of this controversy by the appropriate administrative tribunal, provided that the case is submitted to such tribunal within thirty (30) days of the date of this order.

During the pendency of said stay, IBFO may submit an amended complaint which is consistent with this Court's characterization of the controversy as a minor dispute under the RLA. IBFO may also renew its motion for injunctive relief at any time if the circumstances so warrant.

The Court's previous order of October 1, 1982, is hereby VACATED, and Conrail is relieved of the duty of informing the Court directly of further unilateral job eliminations or work reassignments. The Court will, however, continue to monitor the case closely.

So ORDERED.