**AIRLINE PILOTS ASSOCIATION, INTERNATIONAL, AFL–CIO, Plaintiff-Appellee,**

v.

**TACA INTERNATIONAL AIRLINES, S.A., Defendant-Appellant.**

**No. 84–3036.**

United States Court of Appeals, Fifth Circuit.

Dec. 10, 1984.

---

Fleming & Huck, Joseph Z. Fleming, Miami, Fla., Partee & Waldrip, John B. Waldrip, New Orleans, La., for defendant-appellant.

Barker, Boudreaux, Lamy, Gardner & Foley, Robert H. Urann, New Orleans, La., Cohen, Weiss & Simon, Stephen B. Moldof, New York City, for plaintiff-appellee.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before TIMBERS,* POLITZ and RANDALL, Circuit Judges.

POLITZ, Circuit Judge:

When TACA International Airlines, S.A. (TACA), in the midst of collective bargaining negotiations, noticed its intent to relocate its pilot base from New Orleans to El Salvador and to impose unilaterally a new labor contract on its employees, the Airline Pilots Association (ALPA) invoked the Railway Labor Act, 45 U.S.C. §§ 151–188, and petitioned for injunctive relief. Finding TACA in violation of sections 2, 5 and 6 of the Railway Labor Act, 45 U.S.C. §§ 152, 155 and 156, the district court entered a temporary restraining order followed, after hearing, by a preliminary and permanent injunction prohibiting TACA from relocating the pilot base, unilaterally changing terms of employment, recruiting replacement pilots and interfering with the pilots choice of ALPA as their bargaining agent.

TACA appeals, joined by the nation state El Salvador as amicus curiae, contending that its actions are authorized by the 1982 Air Transportation Agreement between the United States and El Salvador. TACA further maintains that the act of state doctrine precludes judicial intervention in the controversy and, in any event, its violations of United States law, specifically the Railway Labor Act, are excused by the foreign compulsion defense. Finding no merit in any contention advanced and concluding that the injunction was properly granted, we affirm.

*Facts*

TACA is incorporated under the laws of El Salvador and four-fifths of its stock is controlled by Salvadorans. The airline flies from El Salvador to Mexico, various nations in Central America, Miami, New Orleans, Houston and Los Angeles. Approximately 62% of the pilots are Salvadoran nationals, many are American citizens and more than one-half live in the United States. All TACA pilots are members of ALPA and regardless of nationality, residence or seniority, all have been based in New Orleans since 1949 when TACA first instituted service between El Salvador and New Orleans. Since 1968, TACA and ALPA have executed successive collective bargaining agreements under the Railway Labor Act.

In 1969, shortly after the first agreement was reached, TACA and ALPA were involved in litigation very similar to that now before the court. At that time the government of El Salvador requested TACA to relocate the pilot base from New Orleans to El Salvador. When TACA began relocation efforts, ALPA sought injunctive relief, maintaining that if the relocation came to fruition the collective bargaining agreement would be abrogated by Salvadoran law which would bar ALPA's representation of the pilots. The district court agreed and an appropriate injunction issued. On appeal we affirmed, holding in the process that the pilot base dispute was a "major" dispute subject to the court's jurisdiction and not a "minor" dispute resolvable by the Railway Labor Act's adjustment mechanism. *Ruby v. TACA International Airlines, S.A.,* 439 F.2d 1359 (5th Cir.1971).

Since our decision in *Ruby v. TACA,* notable events have occurred which make

---

* Circuit Judge of the Second Circuit, sitting by    designation.

the present factual situation different from that earlier presented. We must determine whether those changes mandate a result different from that reached in 1971. In October 1979, TACA and ALPA entered into the most recent collective bargaining agreement, amendable as of December 31, 1983. On April 19, 1982, the governments of the United States and El Salvador executed a civil aviation agreement designed to regulate and promote air transportation between the two countries. In October of 1983, TACA and ALPA, in accordance with the terms of the collective bargaining agreement, began negotiations looking to the amendment and continuation of the current agreement.

Events continued. On December 20, 1983, El Salvador adopted a new constitution. Article 110, ¶ 4 of that constitution provides in pertinent part:

> Salvadoran public service companies will have their work center and base of operation in El Salvador.

The following day, officials from the Salvadoran Ministry of Labor ordered TACA to move its pilot base to El Salvador. TACA immediately notified its pilots that the pilot base would be moved to El Salvador, that new, individual contracts including substantial changes were to be executed and that ALPA would no longer be recognized as the pilots' bargaining agent. The pilots were given until December 30, 1983 to accept the new terms or lose their employment with TACA. Meanwhile, TACA began advertising for new pilots, preferably Salvadoran, to fly the airline's equipment. ALPA reacted to TACA's actions by seeking the injunctive relief described above.

### Analysis

■ We note at the threshold that the parties do not dispute that TACA is in violation of section 2 First, Second, Third, Fourth and Seventh, and sections 5 and 6 of the Railway Labor Act, 45 U.S.C. §§ 152, 155, 156. TACA's refusal to recognize and bargain with ALPA, and its unilateral attempt to impose a new labor agreement on its pilot employees violate the Rail-

way Labor Act. These same actions were noted as violations in *Ruby v. TACA*, 439 F.2d at 1363.

Although subject to the charge of unnecessary iteration, we perhaps should remind that collective bargaining agreements are central to American labor law and are the essential threads of its fabric. In an Oliver Wendell Holmes lecture at Harvard Law School, entitled Reason, Contract, and Law in Labor Relations, published in 68 Harv.L. Rev. 999, 1002 (1955), Dean Harry Schulman observed:

> Collective bargaining is today, as Brandeis pointed out, the means of establishing industrial democracy as the essential condition of political democracy, the means of providing for the workers' lives in industry the sense of worth, of freedom, and of participation that democratic government promises them as citizens.

A few years later Justice Douglas reiterated in *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 580, 80 S.Ct. 1347, 1351–52, 4 L.Ed.2d 1409 (1960) (with citations and footnotes omitted):

> A collective bargaining agreement is an effort to erect a system of industrial self-government. When most parties enter into contractual relationship they do so voluntarily, in the sense that there is no real compulsion to deal with one another, as opposed to dealing with other parties. This is not true of the labor agreement. The choice is generally not between entering or refusing to enter into a relationship, for that in all probability pre-exists the negotiations. Rather it is between having that relationship governed by an agreed-upon rule of law or leaving each and every matter subject to a temporary resolution dependent solely upon the relative strength, at any given moment, of the contending forces.

### The Air Transportation Agreement

It is TACA's position that the relocation of its pilot base is authorized by the Air Transportation Agreement, an executive agreement, which should be applied to supersede and contravene inconsistent domes-

tic laws, notably including the Railway Labor Act. TACA also contends that Article 14 of the Air Transportation Agreement requires that the pending dispute be resolved by the arbitration mechanism set forth in the agreement.

It is axiomatic that statutes and treaties are to be interpreted, to the maximum extent possible, so as to be consistent and harmonious. *United States v. Lee Yen Tai*, 185 U.S. 213, 22 S.Ct. 629, 46 L.Ed. 878 (1902). But the language of an international agreement, like any agreement, is to be interpreted according to its plain and obvious meaning, absent a clear indication that the parties intend otherwise. *Maximov v. United States*, 373 U.S. 49, 83 S.Ct. 1054, 10 L.Ed.2d 184 (1963).

The express language of the Air Transportation Agreement reflects that the parties did not intend the agreement to replace relevant domestic labor law. To the contrary. Section 1 of Article 8 of the intergovernmental agreement permits each nation to establish offices within the territory of the other nation "for the promotion and sale of air transportation." Immediately thereafter, in section 2 of Article 8, the parties prescribed:

> The designated airlines of one Party may, *in accordance with the laws and regulations of the other Party relating to entry, residence and employment,* bring in and maintain in the territory of the other Party managerial, sales, technical, operational and other specialist staff required for the provision of air transportation.... (Emphasis added.)

This agreement was reached 11 years after our decision in *Ruby v. TACA*. It is apparent that the representatives of the United States and El Salvador did not intend a suspension of the application of the Railway Labor Act or an abrogation of the holding of *Ruby v. TACA*.[1] Nor are we persuaded that the parties to the Air Trans-

portation Agreement intended that a dispute between private parties, here TACA and ALPA, was to be arbitrable under the agreement's provisions. We find no merit in this assignment of error.

### Act of State Doctrine

TACA next argues that the act of state doctrine precludes the injunction against TACA's relocation to El Salvador, lifting as a shield the provision of the Salvadoran Constitution requiring all public service companies to have their work center and base of operations in El Salvador. TACA insists that the Salvadoran government's relocation directive is sufficient to invoke the act of state doctrine. We do not agree.

Under the act of state doctrine our courts will not question the validity of the actions of foreign governments within their own borders. The doctrine was elucidated in *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897):

> Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

The act of state doctrine is not mandated by international law or the Constitution. The doctrine does, however, rest on " 'constitutional' underpinnings." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423, 84 S.Ct. 923, 938, 11 L.Ed.2d 804 (1964). The purpose of the doctrine is to avoid judicial interference with the role of the executive branch in international affairs. As we noted in *Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371, 1380 (5th Cir.1980):

---

1. Because we find that the Air Transportation Agreement is not inconsistent with the Railway Labor Act, we do not reach the issue of whether the Air Transportation Agreement, an executive agreement, is a "treaty" which can supersede prior acts of Congress. *See* Restatement (Second) of the Foreign Relations Law of the United States § 144. *See e.g., Weinberger v. Rossi,* 456 U.S. 25, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982).

Relegating grievances from acts of this sort to executive channels of international diplomacy, the rule is an embodiment of the deference to be accorded the sovereignty of other nations; it averts potential diplomatic embarrassment from the courts of one sovereign sitting in judgment over the public acts of another.

■ The act of state doctrine does not preclude our review of each and every case which touches upon international relations, however minimal. In determining whether to apply the doctrine, we must weigh a number of factors. One of these is the degree of involvement of the foreign state. *Industrial Investment Development Corp. v. Mitsui & Co., Ltd.,* 594 F.2d 48 (5th Cir.1979), *cert. denied,* 445 U.S. 903, 100 S.Ct. 1078, 63 L.Ed.2d 318 (1980). A second factor is the effect a judicial decision in a given case will have on our foreign relations. As the Court noted in *Sabbatino,* "the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches." 376 U.S. at 428, 84 S.Ct. at 940. A third and related factor is whether a decision in a given case will involve the adjudication of the laws, conduct or motivation of a foreign government.[2] This principle has been decisive in two cases before this court in which parties have unsuccessfully invoked the act of state doctrine. *Maltina Corp. v. Cawy Bottling Co.,* 462 F.2d 1021 (5th Cir.), *cert. denied,* 409 U.S. 1060, 93 S.Ct. 555, 34 L.Ed.2d 512 (1972); *Tabacalera Severiano Jorge, S.A. v. Standard Cigar Co.,* 392 F.2d 706 (5th Cir.), *cert. denied,* 393 U.S. 924, 89 S.Ct. 255, 21 L.Ed.2d 260 (1968).

In *Tabacalera,* the sole shareholder of a Cuban corporation whose assets had been confiscated by the Cuban government, sued to recover the purchase price of tobacco sold prior to the takeover to the defendant, an American corporation. We found that the *res* in the case was the debt owed to the plaintiff by an American company in Tampa, Florida. In locating the *res,* Judge Tuttle noted that "the situs of intangible property is about as intangible a concept as is known to the law," and added:

> The situs may be in one place for ad valorem tax purposes; it may be in another place for venue purposes; it may be in more than one place for tax purposes in certain circumstances; it may be in still a different place when the need for establishing its true situs is to determine whether an overriding national concern, like the application of the Act of State Doctrine is involved.

392 F.2d at 714–15 (citations omitted). We then rejected the defendant's contention that, under the act of state doctrine, the confiscation by the Cuban government extinguished the debt. We held that if the *res* is outside the control or territory of the foreign state, the doctrine need not apply:

> when a foreign government performs an act of state which is an accomplished fact, that is when it has the parties and the *res* before it and acts in such a manner as to change the relationship between the parties touching the *res,* it would be an affront to such foreign government for courts of the United States to hold that such act was a nullity.... [But] these acts are to be recognized under the Act of State Doctrine only insofar as they were able to come to complete fruition within the dominion of the [foreign] government.

392 F.2d at 715–16.

In *Maltina,* Judge Wisdom emphasized that "*Tabacalera* and its predecessors teach that the federal courts are to take a pragmatic view of what constitutes an ex-

---

**2.** An additional limitation on the act of state doctrine, which has become known as the "commercial exception" to the doctrine, may subject a foreign nation to domestic law when that nation is acting in a purely commercial capacity. A majority of the Court has yet to accept the commercial exception. *Alfred Dunhill of London v. Republic of Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976). Although we have made reference to this exception, *Compania de Gas de Nuevo Laredo, S.A. v. Entex,* 686 F.2d 322, 326 (5th Cir.1982); *Industrial Investment Development Corp. v. Mitsui,* 594 F.2d 48, 52 (5th Cir.1979), we have not definitively ruled on it and are not required to do so here.

traterritorial action by a foreign state." 462 F.2d at 1027. The plaintiff in that case, a successor to a Cuban corporation whose assets had been confiscated by the Cuban government, sought to preserve its right to use the United States trademark the corporation had registered before the confiscatory decree. We found, as a matter of trademark law, that the *res* in the case, the registered trademark of the Cuban corporation, was located in the United States. We then held that we would recognize a foreign sovereign's actions governing property located within the United States only if it was consistent with our policy and laws. Because a taking of property without compensation violates fundamental constitutional principles, we declined to apply the act of state doctrine.

■ Evaluating these factors in the case at bar we are persuaded that the doctrine presents no bar to the injunction entered by the district court. The factors militate against TACA's position. In so concluding, we do not denigrate the interest of El Salvador or minimize its participation in this dispute. El Salvador has ordered a corporate national to act consistent with its constitution. In its amicus, El Salvador explains its interest in securing the ultimate relocation of the pilot station of what it views as its national air carrier. However, we must remain cognizant of the fact that El Salvador is not a party to this controversy and that TACA is a private party who voluntarily chose to engage in business within the territorial confines of the United States, thereby becoming subject to all relevant domestic laws. We do not adjudicate the validity of Article 110, ¶ 4 of the Salvadoran Constitution, nor do we comment on El Salvador's regulatory practices and policies involving public service companies. That is not our prerogative. We do adjudicate, however, the legality of TACA's response to the governmental directive it received. Insofar as the relationship between TACA and ALPA, that response must be made in a manner consistent with controlling provisions of United States law, specifically and primarily the Railway Labor Act.

The present controversy does not involve sensitive areas of international relations that require our deference to the initiatives of the executive branch. We are persuaded that the principles announced in *Tabacalera* and *Maltina* are dispositive here. Although Judge Tuttle's observation about the difficulty of determining the situs of intangible property remains true today, the *res* or interest in this case, whether we deem it the pilot base or the collective bargaining agreement, is clearly located in the United States. Since 1949, TACA has maintained its pilot base in New Orleans, availing itself of the benefits of American labor and facilities. Continuously since 1968, TACA has been a party to collective bargaining agreements with ALPA for its pilots. In 1979, the parties entered into a collective bargaining agreement which is presently amendable. Consistent with the holdings in *Tabacalera, Maltina,* and *Ruby v. TACA,* we cannot give effect to El Salvador's directive to TACA to extinguish *ex parte* the collective bargaining agreement and relocate the pilot base. Those acts directly affect interests located within the United States and contravene fundamental principles of American labor policy. The act of state doctrine will not be given application in this instance.

*Foreign Compulsion Defense*

■ TACA claims that its violations of the Railway Labor Act should be excused because they were done under the compulsion of Salvadoran law. In evaluating the foreign compulsion defense, we balance the following factors:

(a) vital national interests of each of the states,

(b) the extent and the nature of the hardship that inconsistent enforcement actions would impose upon the person,

(c) the extent to which the required conduct is to take place in the territory of the other state,

(d) the nationality of the person, and

(e) the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state.

Restatement (Second), Foreign Relations Law of the United States § 40. *In re Grand Jury Proceedings v. Field,* 532 F.2d 404 (5th Cir.), *cert. denied,* 429 U.S. 940, 97 S.Ct. 354, 50 L.Ed.2d 309 (1976); *United States v. First National City Bank,* 396 F.2d 897 (2d Cir.1968).

For reasons previously discussed, we also find this defense without merit. As we have noted, collective bargaining agreements are a cornerstone of our national labor policy. We neither hold nor suggest that TACA may not relocate its pilot base. We hold only that TACA must relocate its pilot base, and effect the other intended steps in accordance with the substantive law and procedures set forth in the Railway Labor Act and other relevant domestic laws.

The judgment of the district court is AFFIRMED.