Fred **LEMNITZER** and **Ken Green**, Plaintiffs,

v.

**PHILIPPINE AIRLINES**, Defendant.

**No. C–90–2262 DLJ.**

United States District Court,
N.D. California.

Aug. 23, 1991.

Lawrence Ball, with the law firm, Louis A. Highman, Bruce J. Highman, and Lawrence Ball, San Francisco, Cal., for plaintiffs.

Cynthia E. Gitt, formerly with the law firm of Ford & Harrison, San Francisco, Cal., and presently with the law firm of Epstein, Becker, Mulkeen & Green, Los Angeles, Cal., for defendant.

## ORDER

JENSEN, District Judge.

On August 21, 1991, this Court heard defendant's motion for partial summary judgment. Cynthia E. Gitt of Ford & Harrison appeared for defendant Philippine Airlines. Lawrence Ball appeared for plaintiffs Fred Lemnitzer and Ken Green. Having considered the papers submitted, the arguments of counsel, the applicable law, and the entire record herein, the Court GRANTS defendant's motion for the following reasons.

## I. BACKGROUND

This is an action brought by two former employees of defendant Philippine Airlines, Inc. ("PAL"), alleging wrongful termination on the basis of age and national origin, in violation of Title VII, 42 U.S.C. §§ 2000e *et seq.*, the California Fair Employment and Housing Act ("FEHA"), and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 626, and other pendent state claims. Both plaintiffs are U.S.

citizens who are not of Filipino national origin.

Defendant is a foreign corporation and subsidiary of the Republic of the Philippines and is headquartered in Manila. PAL provides cargo and passenger service between the United States and the Philippines, using airports in Los Angeles, San Francisco, and Honolulu ("line cities") for departures and landings en route to or from Manila. PAL is prohibited from transporting passengers between U.S. cities.

Prior to the summer of 1988, PAL also maintained District Sales Offices in fourteen cities in North America: Miami; Washington, D.C.; New York; Toronto; Chicago; Detroit; Dallas; Houston; San Diego; Los Angeles; San Francisco; Seattle; Honolulu; and Vancouver, British Columbia. Each office was headed by a District and/or Area Sales Manager. In addition to the District Sales Offices, there were certain marketing functions performed on behalf of all districts by managers in San Francisco. One such function was the Tours and Charters Department.

PAL frequently filled certain sales and other key management positions with persons hired or trained in the Philippines, who were expected to return to the Philippines or go to any international destination to which they are assigned, and who were deemed "loyal" to the interests of PAL.[1] This policy translated into a practice of preserving key managerial positions for persons who were citizens of the Philippines and/or participants in a group of managers who rotate from the Philippines to various positions around the world [hereinafter referred to as "expatriates"].[2] However, over the years PAL has also appointed U.S. citizens who are non-Filipinos to such key positions.

Plaintiff Fred Lemnitzer ("Lemnitzer") began work for PAL on or about April 21, 1969, and worked continuously for PAL until his termination effective September 30, 1988. He held various management positions during that time, and his last position was that of Tours and Charters Manager in San Francisco.

Plaintiff Ken Green ("Green") worked continuously for PAL from on or about April 19, 1976, until his termination on or about September 30, 1988. He also held management positions throughout this time. It is disputed as to what particular position he held at the time of his termination, but that issue is immaterial to the present motion.

On or about August 8, 1988, PAL announced that it was closing all of its District Sales offices in the United States outside of California and Hawaii due to financial losses stemming from PAL's U.S. operations, and that it would be abolishing several other positions throughout its U.S. operations. PAL had informed Lemnitzer in June 1988 that PAL would be abolishing the position of Tours and Charters Manager, as well as the Tours and Charter Department. PAL states that many of the expatriates whose positions were abolished were reassigned to posts outside the United States.

The respective rights of PAL and U.S. carriers to operate in the other's country are governed by the Air Transport Agreement (ATA) negotiated by the United States and the Republic of the Philippines in 1981 and clarified or modified from time to time thereafter. The provisions pertinent to the present motion come from Article 8 of the ATA, which provides as follows:

Article 8. Commercial Opportunities

(1) The airline ... of one Party may, subject to the nondiscriminatory requirements of domestic laws and regulations of the other Party, establish offices in the territory of the other Party for the promotion and sale of air transportation.

---

1. Plaintiffs note that PAL's Basic Policy, as set forth in the Personnel Policies and Procedures Manual, requires loyalty of all PAL employees, not just those who are citizens or expatriates of the Republic of the Philippines.

2. Plaintiffs cite evidence that only one expatriate, Pedro Oviedo, is not of Filipino national origin.

(2) The designated airline … may, in accordance with the laws and regulations of the other Party relating to entry, residence and employment, bring in and maintain in the territory of the other Party managerial, sales, technical, operational and other specialist staff required for the provision of air transportation.

(3) Each designated airline may perform its own ground handling in the territory of the other Party…. If the designated airline does not self-handle it may, subject to domestic laws and regulation of the other Party, select among competing agents for such services. Ground handling includes: the functions of checking in passengers and baggage, maintenance … ramp … services for cargo; flight planning; operations and dispatch … cargo buildup and breakdown….

ATA art. 8(1)–(3).

PAL now moves for partial summary judgment on plaintiffs' claims of discrimination on the basis of national origin. Specifically, defendant contends that, as a matter of law, the ATA gives PAL full freedom to place in key sales and managerial positions Filipino citizens of its choice, and that PAL is exempt from the requirements of Title VII and the FEHA with respect to such employees.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Under Rule 56(c) of the Federal Rules of Civil Procedure, a district court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Recognizing that summary judgment motions can contribute significantly to the resolution of litigation when there are no factual issues, the Supreme Court and the Ninth Circuit have established the following standards for consideration of such motions: "If the party moving for summary judgment meets its initial burden of iden-

tifying for the court those portions of the materials on file that it believes demonstrates the absence of any genuine issues of material fact," the burden of production then shifts so that "the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, *specific facts* showing that there is a genuine issue for trial.'" *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quoting Fed.R.Civ.P. 56(e) (emphasis added) and citing *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103–04 (9th Cir.), *cert. denied*, 479 U.S. 949, 107 S.Ct. 435, 93 L.Ed.2d 384 (1986) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). With respect to these specific facts offered by the non-moving party, the court does not make credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the non-moving party. *T.W. Elec. Serv.*, 809 F.2d at 630–31 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Rule 56(c) nevertheless requires this Court to enter summary judgment, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 106 S.Ct. at 2552. The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient: "[T]here must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). This Court thus applies to either a defendant's or plaintiff's motion for summary judgment the same standard as for a motion for directed verdict: "[W]hether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.*

## III. DISCUSSION

### A. *Extra-territorial assignments.*

■ Defendant characterizes plaintiffs' claims of discrimination on the basis of national origin as relying in part on PAL's assignment of certain employees other than plaintiffs to non-U.S. positions following the events in the summer of 1988. However, Title VII itself states that its provisions do not apply to employment of aliens outside the United States. *See* 42 U.S.C. § 2000e–1. Moreover, the Supreme Court has recently held that Title VII does not protect U.S. citizens employed by U.S. corporations outside the United States. *See EEOC v. Arabian Am. Oil Co.,* — U.S. ——, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991). Plaintiffs in opposition contend that the failure to appoint them to overseas positions is not the basis of their claim, but is instead "relevant to plaintiffs' general claim" of discrimination, i.e., is evidence of discrimination on the basis of national origin. While that may be, to the extent plaintiffs' claims are based on assignment to positions outside the United States, defendant is entitled to partial summary judgment on such claims.

### B. *Impact of Title VII on a foreign-owned corporation.*

Under both Title VII and California statute, an employer may discriminate on the basis of national origin so long as the grounds for such discrimination constitute a "bona fide occupational qualification," commonly referred to as a "BFOQ."[3] *See* 42 U.S.C. § 2000e–2(e); Cal. Gov't Code § 12940. Defendant states that the present motion is not a factual inquiry into whether BFOQ rights are implicated in the

PAL positions at issue; rather, the present motion is better characterized as one seeking an adjudication that, as a matter of law, the ATA and laws regarding treaties between the U.S. and other nations give PAL total authority to prefer its own citizens with respect to filling key management and technical positions in its U.S. operations, and therefore the standards of Title VII—and similarly, the FEHA—are not applicable.[4]

■ This Court's role in interpreting treaties is limited to ascertaining and enforcing the intent of the parties, and the literal meaning of the treaty's language controls "unless application of the words to the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories." *Sumitomo Shoji Am., Inc. v. Avagliano,* 457 U.S. 176, 180, 185, 102 S.Ct. 2374, 2377, 72 L.Ed.2d 765 (1982). As treaties are considered "the supreme Law of the Land," U.S. Const. art. VI, they supersede all state law, and they will be enforced over directly conflicting federal law unless Congress has clearly and affirmatively disavowed rights provided by treaty. *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 21, 83 S.Ct. 671, 677, 9 L.Ed.2d 547 (1963); *Spiess v. C. Itoh & Co. (Am.), Inc.,* 643 F.2d 353, 356 (5th Cir.1981), *vacated on other grounds,* 457 U.S. 1128, 102 S.Ct. 2951, 73 L.Ed.2d 1344 (1982). Prior courts have found that Title VII did not intend to repudiate treaty provisions similar to the ones at issue in the present case. *See, e.g., Spiess,* 643 F.2d at 362.

■ As cited above, the ATA between the Philippines and the United States per-

---

**3.** A BFOQ analysis is applied in cases where there has been a finding of intentional discrimination in violation of Title VII. *MacNamara v. Korean Air Lines,* 863 F.2d 1135, 1146 n. 14 (3rd Cir.1988).

**4.** Plaintiffs claim that PAL has discriminated on two bases: (1) preferring citizens of the Philippines over plaintiffs; and (2) preferring U.S. citizens of Filipino national origin over plaintiffs. However, defendant limits the present inquiry to consideration of only its preference for Filipino citizens in certain key positions. *See* Defendant's Memorandum of Points and

Authorities in Support of Motion for Partial Summary Judgment on Legal Defense to National Origin Discrimination Claims 12:5–10 (filed July 17, 1991).

The Court also notes that the present motion does not seek to determine whether plaintiffs' positions at the time of termination constituted "key" positions falling under Article 8(2) of the ATA. Therefore the Court views the present motion solely as examining the interplay between the ATA and U.S. discrimination laws with respect to positions satisfying Article 8(2).

mits PAL to "bring in and maintain" in the United States its own "managerial, sales, technical, operational, and other specialist staff required for the provision of air transportation." ATA art. 8(2). The clear import of these terms is that PAL is entitled to "bring in" to the United States the key personnel of its choice, i.e., its own citizens from outside the United States. Thus an initial reading of the ATA language supports a finding that PAL is entitled to prefer its own citizens, thereby discriminating *per se* on the basis of national origin. A preliminary finding is that the parties intended that PAL would be free to make such appointments without being hindered by otherwise applicable laws forbidding discrimination on the basis of national origin. In short, to grant such freedom under the ATA only to take it away under Title VII makes no sense.

Under the language of the ATA, PAL is entitled to hire its own citizens to managerial and other positions so long as such acts are performed "in accordance with the laws and regulations" of the United States "relating to entry, residence and employment." ATA art. 8(2). PAL contends that the pertinent "laws and regulations" of section (2) are those referring to immigration, noting that all personnel whom PAL brings into the United States pursuant to the ATA are covered by E–1 treaty trader visas. *See* 8 U.S.C.A. § 1101(a)(15)(E).[5] This is a logical conclusion in that the "entry" and "residence" of those being brought into the United States would seem to implicate immigration laws alone, and as such laws also regulate employment of aliens, defendant's construction would seem more in keeping with the intent of an ATA than would an interpretation construing the term "employment" as referring to *all* laws touching upon employer-employee relations, including Title VII.

In further support of this construction, PAL notes that the "surrounding" sections of the ATA are more specifically linked to U.S. laws regarding discrimination. Section (1) states that PAL may establish sales offices in the United States "subject to the *nondiscriminatory* requirements of domestic laws and regulations of the other Party." ATA art. 8(1) (emphasis added). PAL further emphasizes the distinction between this section and section (2) in that the "discrimination" sought to be prevented is the discrimination achieved by domestic laws favoring a domestic airline over a foreign owned in the establishment of sales offices in the United States, *see* Walker, *The Post–War Commercial Treaty Program of the United States*, 73 Pol.Sci.Q. 57, 61–67, and thus section (1) has nothing to do with employees posted to such offices.

In like manner, PAL notes that section (3) focuses on the hiring of ground handling employees in the event PAL chooses not to "self-handle" those duties. In such a case, PAL is expressly *"subject to domestic laws and regulation"* of the United States in selecting among competing entities to perform such services. ATA art. 8(3). Thus PAL contends that only section (3) truly implicates Title VII considerations in employment as it involves the hiring of local employees in the event PAL chooses not to "self-handle."

In further support of its position, PAL analogizes the ATA to Treaties of Friendship, Commerce and Navigation (FCNs) between the United States and other countries. Such treaties were executed with various countries following World War II. "Although initially negotiated primarily for the purpose of encouraging American investment abroad, the [FCNs] secured reciprocal rights and thus granted protection to foreign businesses operating in the United States." *MacNamara v. Korean Air Lines*, 863 F.2d 1135, 1138 (3rd Cir.1988) (citing Walker, *Treaties for the Encouragement and Protection of Foreign In-*

5. Similarly, under the Code of Federal Regulations:

> An alien employee of a treaty trader may be classified E–1 if the employee is or will be engaged in duties of an *executive or supervisory character, or,* if employed in a minor capacity, the employee had *special qualifications that make the services to be rendered essential* to the efficient operation of the enterprise....

*See* 41 C.F.R. § 41.51(c) (1990) (emphasis added).

*vestment: Present United States Practice,* 5 Am.J.Comp.L. 229 (1956)). In analyzing employment claims under such treaties, the courts have consistently held that a foreign power's "freedom of choice" in filling key employment positions in its U.S. operations is not to be unduly compromised by U.S. employment laws. *See, e.g., id.; Wickes v. Olympic Airways,* 745 F.2d 363 (6th Cir. 1984) (foreign corporation is permitted under FCN to give preference to its own citizens in hiring essential personnel); *Avigliano v. Sumitomo Shoji Am., Inc.,* 638 F.2d 552 (2d Cir.1981) (hiring of management-level employees by U.S. company that was wholly owned subsidiary of an FCN corporation reconciled with Title VII by construing treaty provisions as a BFOQ entitled to broad interpretation), *vacated on other grounds,* 457 U.S. 176, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982); *Spiess v. C. Itoh and Co. (Am.), Inc.,* 643 F.2d 353 (5th Cir.1981) (U.S. company that was wholly owned subsidiary of an FCN corporation was fully insulated from anti-discrimination laws with respect to hiring executives and technical personnel), *vacated on other grounds,* 457 U.S. 1128, 102 S.Ct. 2951, 73 L.Ed.2d 1344 (1982).

The Court finds persuasive in light of the particular circumstances of the present case the conclusion that, pursuant to an existing international agreement analogous to an FCN, a foreign corporation is permitted to prefer its own citizens in certain key positions without fear of liability under U.S. employment laws. As noted above, FCNs guaranteed reciprocal rights to the foreign corporation operating on U.S. soil. In the United States, domestic airlines are required by law to be owned and directed by U.S. citizens. *See, e.g.,* 49 U.S.C.App. §§ 1301(3), (16), 1371 (limiting issuance of certification for "air carriers" to U.S. citizens or corporations of which president and ⅔ of directors are U.S. citizens and at least 75% voting interest is owned or controlled by U.S. citizens). It is unlikely the United States intended to absolve itself of this policy in conducting its operations in the Philippines, and therefore, under the reciprocal rights granted under the ATA, it would seem that PAL is entitled to place its own citizens in similar key managerial positions at its own discretion.

More importantly, rather than just being a foreign-owned corporation, PAL is a subsidiary of the government of the Philippines itself. Undoubtedly the government of the United States would demand full freedom to appoint its own citizens to any key position of its own overseas subsidiaries, and it is thus tenable to conclude that PAL is entitled to a similar, reciprocal expectation. Moreover, this Court is hesitant to find a ready basis for assessing liability or damages—or even the costs of litigation—against the Treasury of the Philippines solely on the basis that that government found the placement of its own citizens in key positions in the U.S. operations of its subsidiary, PAL, necessary to the provision of air services. As much as FCNs give foreign corporations the freedom to "manage their investment in the host country," *Spiess v. C. Itoh and Co. (Am.), Inc.,* 643 F.2d 353, 361 (5th Cir. 1981), *vacated on other grounds,* 457 U.S. 1128, 102 S.Ct. 2951, 73 L.Ed.2d 1344 (1982), then such protection should presumably be even greater when dealing with corporations owned by the very governmental entity which originally entered into the FCN.

Plaintiffs focus on several arguments distinguishing the present action from the above cases discussing FCNs. First, the ATA is not an FCN, and therefore it should not be accorded the same status. Second, each of the FCNs discussed in the above cases included the critical language "of their choice" in the subject provisions, which language is not included in the ATA between the Philippines and the United States. Finally, a decision of the Equal Employment Opportunity Commission (EEOC) involving language identical to that in the present case specifically held that the foreign employer must still meet the requirements of Title VII.

As to plaintiffs' first contention, although the ATA has not been formally designated an "FCN" as were the agreements at issue in the above cases, it functions as such for all intents and purposes.

Significantly, the United States had intended to enter into such a relationship from early on. In an agreement executed in connection with the liberation of the Philippines, the two countries expressed their intent to form an FCN:

The two contracting parties mutually agree that they will forthwith enter into negotiations for the conclusion of treaties and agreements regulating relations between the two countries, *including a treaty of friendship, commerce, and navigation,* an executive agreement relating to trade, a general relations treaty, a consular convention, and other treaties and agreements as may be necessary, and will endeavor to conclude these instruments as soon as may be possible.

Provisional Agreement Concerning Friendly Relations and Diplomatic and Consular Representation art. IV (executed July 4, 1946). Given the special relationship between the United States and the Republic of the Philippines over the course of many decades, it is not unsurprising that the parties never executed a single, all-encompassing FCN at one single time.[6]

Moreover, citizens of the Philippines hired by PAL for U.S. positions falling under Article 8(2) of the ATA are treated as employees of an FCN/treaty-trader nation under the immigration laws. Specifically, these individuals are covered by E–1 treaty trader visas, which are granted to persons defined as "an alien entitled to enter the United States under and in pursuance of the provisions of *a treaty of commerce and navigation* between the United States and the foreign state of which he is a national." 8 U.S.C. § 1101(a)(15)(E) (emphasis added). Therefore, the United States has implicitly, if not in fact explicitly, granted full FCN/treaty-trader status to the ATA between the United States and the Republic of the Philippines.

Based on both the original intent of the parties, as expressed in the Provisional Agreement executed in 1946 and the lan-guage of the ATA, and the status given to Filipino citizens of PAL under U.S. immigration laws, the Court is fully persuaded that the ATA has clearly achieved treaty status, if not in fact status as an FCN. Therefore the above authorities discussing the effect of Title VII on FCNs are fully relevant and applicable to the present case.

Secondly, the Court finds that the absence of the words "of their choice" in Article 8(2) of the ATA does not deprive that agreement of FCN status. The language of 8(2) provides that defendant may "bring in and maintain" those key employees "required" for the conduct of PAL's business in the United States. The determination of who is in fact "required" to ensure efficient and effective administration of PAL's U.S. operations undoubtedly lies within the discretion of PAL itself. Therefore the Court finds that the clear meaning of Article 8(2) sufficiently parallels that of similar provisions in formal FCN agreements, even in the absence of the words "of their choice."

Finally, plaintiffs rely on two cases, one from the EEOC and one from the Fifth Circuit, to support their position. In *Foreign Airline Subject to Ban on National Origin Bias,* [1986] EEOC Decisions (CCH) ¶ 6866 (Apr. 25, 1986), a case involving identical language to that in the present ATA, the EEOC held that the plain meaning of the subject Protocol's requirement that appointment of key managerial positions be made "in accordance with the laws and regulations relating to entry, residence and employment of the other Party" was that each party must obey the employment laws of the other while operating in each other's territory. *Id.* at 7101. Thus the foreign employer was subject to the proscriptions of Title VII. That decision, however, is not binding on this Court. Moreover, the EEOC did not fully consider the particular status given to management of airlines, especially those which are owned in major part by the sovereign state itself.

6. Indeed, contrast U.S. relations with the Philippines both before, during, and after World War II, when most modern FCNs were executed, with U.S. relations with Japan during those same periods.

Finally, plaintiffs rely on *Airline Pilots Ass'n, Int'l v. TACA Int'l Airlines, S.A.,* 748 F.2d 965 (5th Cir.1984), *cert. denied,* 471 U.S. 1100, 105 S.Ct. 2324, 85 L.Ed.2d 842 (1985), which involved an ATA between El Salvador and the United States containing language identical to the present. There the Fifth Circuit held that neither the ATA nor the "act of state" doctrine allowed defendant to unilaterally move its pilot base from New Orleans to El Salvador—thereby abrogating any existing collective bargaining unit with the pilots' union as Salvadoran law prohibits such union representation—even though such move was in order to comply with the provisions of a newly adopted Salvadoran constitution. Significantly, prior to the negotiation of the ATA, the Fifth Circuit had already ruled previously on this same issue in the same case (although the move at that time was merely pursuant to the wishes of TACA rather than a constitutional mandate), holding that a unilateral move of this sort would violate the Railway Labor Act, 45 U.S.C. §§ 151–188. *Ruby v. TACA Int'l Airlines, S.A.,* 439 F.2d 1359 (5th Cir.1971). In examining the language of and circumstances preceding the ATA subsequently reached, the Fifth Circuit concluded it was apparent that "the representatives of the United States and El Salvador did not intend a suspension of the application of the Railway Labor Act or an abrogation of the holding of *Ruby v. Taca*." *Taca,* 748 F.2d at 969.

In the present case, there is no such history of prior judicial rulings between the United States and PAL comparable to that in *TACA*. Moreover, *TACA* itself did not deal with Title VII, but only the duties of an employer with regard to its unionized employees to recognize the union representing them. Therefore the Court is not persuaded by either of the cases plaintiffs' rely on. Instead, the Court finds that the ATA between the United States and the Philippines permits PAL to prefer its citizens to key positions falling under Article 8(2) of the ATA without implicating the national origin provisions of Title VII. Thus defendant is entitled to partial summary judgment on this claim.

## IV. CONCLUSION

For the foregoing reasons, defendant's motion for partial summary judgment is GRANTED on its claim under Article 8(2) of the ATA that defendant's preference for its own citizens in key positions does not violate either Title VII or the FEHA, and on any of plaintiffs' claims based on assignment of employees to positions outside the United States.

A status conference in this matter is hereby scheduled for Wednesday, November 13, 1991, at 9:00 a.m. Parties are directed to file a status conference statement prior to that date in accordance with the rules of this Court.

IT IS SO ORDERED.